295 Ga. 44
FINAL COPY

S13A1893. PEOPLES v. THE STATE.

NAHMIAS, Justice.

Appellant Kevin Peoples was convicted of felony murder and several other crimes in connection with a home invasion that resulted in the shooting death of J.R. Morrow. On appeal, he contends that: (1) the evidence at trial was insufficient to support his conviction for the kidnapping with bodily injury of Morrow's father; (2) the trial court erred by admitting hearsay statements made by a co-conspirator before the conspiracy was formed; (3) the court erred by admitting evidence of a prior bad act by Appellant; (4) the court erred by allowing the prosecutor to refer to jurors by name and to make an inappropriate demonstration during closing arguments; and (5) Appellant's trial counsel provided ineffective assistance by not objecting to portions of the prosecutor's closing arguments. We conclude that the trial court erred in admitting the prior act evidence, but we also conclude that this error was harmless; Appellant's

other enumerations of error lack merit. Accordingly, we affirm.[1]

1.  Viewed in the light most favorable to the verdict, the evidence presented at trial showed the following.

(a)  Background.  In October of 2002, 20-year-old J.R. Morrow ("J.R.") was living with his father, James Morrow ("Mr. Morrow"), and his father's girlfriend, Judy McClure, at Ms. McClure's house in Douglas County. J.R., who was unemployed, spent almost every day with his cousin, Drew Collins, who

---

[1] The crimes occurred on October 15, 2002.  On November 15, 2002, a Douglas County grand jury indicted Appellant, Giovanni Little, Justin Brown, and Appellant's brother, Byron Peoples, for malice murder, felony murder, kidnapping with bodily injury, aggravated assault, aggravated battery, and burglary.  On September 7, 2005, Byron Peoples entered a negotiated plea of guilty to three of the charges, and the trial court sentenced him to serve concurrent terms of ten years in prison followed by ten years on probation.  As a condition of his plea agreement, he promised to cooperate fully in the investigation and to testify against Little and Brown but not against his brother.  However, at the plea hearing, Byron Peoples testified under oath that the participants in the home invasion in addition to himself were Appellant, Little, and Brown.

On September 23, 2005, a second indictment was returned against Appellant, Little, and Brown that included the same charges as the first indictment plus an additional charge of aggravated assault.  On November 10, 2005, Little entered a negotiated plea of guilty to three of the charges, and the trial court sentenced him to concurrent terms of life in prison for felony murder and kidnapping with bodily injury and a consecutive term of 20 years in prison for aggravated assault.  As a condition of his plea agreement, Little promised to cooperate fully in the investigation and to testify at the upcoming trials of Brown and Appellant.  On November 30, 2005, after a two-week jury trial at which Little testified, Brown was acquitted of malice murder but found guilty of all other charges.  The trial court sentenced Brown to consecutive terms of life in prison for felony murder and kidnapping with bodily injury, a consecutive term of 20 years in prison for aggravated assault, and a consecutive term of 20 years on probation for another aggravated assault.  See Brown v. State, 291 Ga. 750, 750 & n. 1 (733 SE2d 300) (2012) (affirming Brown's convictions).

On December 21, 2006, after a two-week jury trial at which Little again testified, Appellant was acquitted of malice murder but found guilty of all other charges.  The trial court sentenced him to consecutive terms of life in prison for felony murder and kidnapping with bodily injury, a consecutive term of 20 years in prison for aggravated assault against Morrow's father, and a consecutive term of 20 years on probation for aggravated assault against the homeowner; the remaining charges merged.  Appellant filed a motion for new trial on January 5, 2007, which he amended on November 7, 2012, and January 29, 2013.  After an evidentiary hearing, the trial court denied the motion as amended on February 25, 2013.  Appellant filed a timely notice of appeal, and the case was docketed in this Court for the September 2013 term and submitted for decision on the briefs.

was about the same age and also unemployed. Co-indictee Justin Brown, a friend of J.R., spent the five days before the home invasion with J.R. and Collins; Brown was with them on October 12, when Mr. Morrow took $1,000 in cash out of a gun safe at the house and gave it to J.R. to help buy a car that afternoon.

On the evening of the following day, October 13, Collins was with J.R. and Brown at a Walmart, where he met Appellant and his younger brother, co-indictee Byron Peoples ("Byron"), after Brown called Appellant and asked him to come there. On October 14, Brown told Collins that he was thinking about making some money by committing a robbery. According to Collins, Brown was always talking about robbing people if he could get a gun, but on this occasion, Brown said he was thinking about robbing Mr. Morrow. Brown explained that Mr. Morrow had about $10,000 in the safe at the McClure house and that if he could get a gun, he would get some friends, including Appellant and Appellant's brother, to come with him to the McClure house late at night and rob Mr. Morrow. At that point, Collins informed Brown that J.R. was his cousin, and Brown stopped talking about his plan.

The next morning — October 15 — J.R. dropped Brown off at the home

of Brown's friend, co-indictee Giovanni Little, who lived nearby. According to Little, Brown told Little about the money in the safe and said that he wanted to steal it. Brown instructed Little to call Appellant, who also lived nearby and who, unlike Brown and Little, had his own car — a small black Toyota Corolla. Little called Appellant, and Brown and Appellant spoke on the phone. That evening, Appellant drove with Byron to Little's house and picked up Little and Brown. The plan was for Appellant and Little to get into the McClure house and keep everyone in one room so that Brown could slip in and steal the money without being recognized.

(b) The Crimes. Around 9:00 p.m., Byron drove Appellant, Brown, and Little past the McClure house to a gas station three driveways up the street, where Brown used a payphone to call the house at 9:11 p.m. Mr. Morrow answered, and when Brown asked if J.R. was there, Mr. Morrow said no. In reality, J.R. was downstairs sleeping in his room, but Mr. Morrow knew that J.R. wanted to get some rest, and he did not want Brown to come back over. Brown hung up and then walked with Appellant and Little down the street to the house while Byron drove to a parking lot across the street from the house and waited.

Appellant and Little climbed the stairs to the front door while Brown hid

3

off to the side. Inside the house, Mr. Morrow was watching television, and Ms. McClure was getting ready for bed. Mr. Morrow heard a noise on the front porch and thought the wind had blown open the storm door, so he went to the front door and turned on the porch light. As he started to open the door, he saw that Appellant and Little were leaning against it, and he put his foot on the door to keep it from opening further. One of the men asked if "John" was there, but Mr. Morrow got out only a few words in response before one of the men reached inside with a gun and shot Mr. Morrow in the shoulder. Appellant and Little pushed their way inside as Mr. Morrow fell to the floor and was shot a second time in the leg.

Hearing the commotion, Ms. McClure left her bedroom and started to come down the hall, but she stopped when a man shot at her — she fortunately was not hit — and ordered her back into the bedroom; she complied. Mr. Morrow was then forced at gunpoint down the hallway and into the bathroom. Mr. Morrow opened the bathroom door several times but retreated when the gunman told him to shut the door. From the bathroom, Mr. Morrow heard running through the house, a gunshot from the direction of the basement stairs, and someone saying, "I found him, I found him," followed by more running as

Appellant, Little, and Brown left the house to flee the scene in the getaway car that Byron had waiting across the street.

After the intruders left, Mr. Morrow and Ms. McClure ran to the basement, where they found J.R. lying face up in the doorway of his bedroom with a single gunshot wound to the chest. He was dead.

As they drove away from the house, Appellant told Little that he had tried to scare the people in the house, and not to tell anyone what had happened. Byron dropped Little and Brown off at Little's home and then drove home with his brother. At 9:38 p.m., Appellant placed a call from his cell phone to the Little residence. At 10:34 p.m., Appellant called Lauren Lee, his girlfriend and the mother of his infant daughter; he told Lee that if anyone asked, she should say he had been with her all night. At 10:38 p.m., Brown made a similar call to his girlfriend, Meggie Brookshire. Both women agreed to provide the alibis.

(c)    The Investigation. Officers from the Douglas County Sheriff's Office interviewed Mr. Morrow at the hospital. He told them about the telephone call from Brown just before the home invasion and gave physical descriptions of the two men that he saw on his front porch that matched Appellant and Little. When Collins arrived at the hospital, he told the officers

5

what Brown had said about wanting to rob Mr. Morrow and getting Appellant to help him; Collins knew Appellant only by his first name, but he had met Appellant at the Walmart two days before the crimes. Collins also gave the officers a description of Little, said that it was likely that Little was involved if Brown was, and rode with the officers to point out Little's house.

About six hours after the crimes — around 3:00 or 3:30 a.m. on October 16 — officers went to Little's house, telling him that they needed information to help locate Brown. Little told the officers about Brown's call to the McClure house the prior evening, but he lied and said that Brown made that call from Little's house. Little also claimed that he had been with his girlfriend Tabitha Wheeler all night. As soon as the officers left, Little called Wheeler and asked her to say that he was with her all night if anyone asked, and she agreed to do so. Shortly thereafter, the sheriff's office learned that Little had an outstanding warrant from another jurisdiction, and officers were sent back to Little's house to arrest him.

Meanwhile, officers were headed to Wheeler's residence to confirm Little's alibi. When Wheeler first spoke to the officers around 4:00 or 4:30 a.m., she said that Little had been with her at her home that night from 8:30 to 9:30

6

p.m. Later that morning, however, she went to the sheriff's office to give a statement and was told that a man had been killed in a robbery the night before. Wheeler then admitted that she had lied to the officers earlier, said that Little had asked her to lie for him, and explained that Little had stopped by her place earlier the day before but was not there between 8:30 and 9:30 p.m. After the officers told Little that Wheeler had refused to alibi him, he began to tell them more about what actually happened, including that Appellant and Byron were involved in addition to himself and Brown.

That afternoon, officers located Brown and arrested him in connection with the murder. Brown initially said that he had been with his girlfriend at the time of the home invasion. However, the officers had already contacted her, and she told them that Brown was with her during the day but that she had dropped him off at Little's place around 8:00 p.m. She also said that Brown had called her later that night to ask her to falsely alibi him.

Earlier that afternoon, Appellant called his girlfriend Lee and asked her to pick his brother up from work and take him to her house in Powder Springs, which was about 20 minutes from the house where Appellant and his brother lived with their parents. Lee had never picked Byron up from work before, but

7

she did as Appellant asked. Later that day, Byron was outside talking on the phone to Appellant when Lee overheard him say something about "snitching." Appellant and his brother spent the night at Lee's house that night, even though there was no electricity there at the time. That was the first and only time that Byron spent the night at Lee's house.

The following morning — October 17 — Byron stayed at Lee's home while she and Appellant went to work. That afternoon, officers executed a search warrant at Appellant's house. While they were conducting the search, someone in a small black car like Appellant's came around the curve, hit the brakes, turned around, and left the subdivision in a hurry; an attempt to locate the vehicle was unsuccessful. During the search, officers found an empty plastic ammunition tray for .25-caliber Remington bullets under Appellant's bed. Four .25-caliber shell casings and three .25-caliber bullets — all Remington brand — had been recovered from the crime scene and J.R. Morrow's body.

Sometime after Lee got off work at 3:00 p.m., Appellant called her and asked her to bring Byron to Atlanta and drop him off at a parking lot near the Georgia Dome. Appellant also asked Lee if she had spoken to his mother; when Lee said no, Appellant told her that if she spoke to his mother, she should say

8

that she had not seen Appellant or his brother. When Lee arrived at the parking lot near the Georgia Dome, Appellant was already there in his black Corolla. He did not look good, and Lee could tell that something was wrong. Byron got into the car with Appellant, and Lee drove away.

Appellant and his brother fled to Texas, where they were apprehended in Appellant's car the next day, October 18. Lee spoke with Appellant several times while he was in jail in Texas. He told her not to tell the police anything and said that the reason they got caught was because "[t]he white boy is talking," referring to Brown; Brown had given an incriminating statement to officers by that time. Lee was identified through Appellant's cell phone records and was interviewed on October 31. She initially told the officers that Appellant was with her at the time of the home invasion; as the interview progressed, however, Lee became emotional, and she ultimately admitted that she had lied, that Appellant was not with her, and that he had called her on the night of October 15 and asked her to provide him with a false alibi.

Appellant was extradited back to Georgia, where he shared a cell for a month at the Douglas County Jail with George Crane. Crane testified at trial that Appellant said that he had accidentally shot a couple of people when he

9

went somewhere to get money, that he did not mean to shoot them, and that he was only trying to scare them.

2. When viewed in the light most favorable to the verdict, the evidence presented at trial and summarized above was sufficient to authorize a rational jury to find Appellant guilty beyond a reasonable doubt of the crimes for which he was convicted and sentenced. See Jackson v. Virginia, 443 U. S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979). See also OCGA § 16-2-20 (defining parties to a crime); Vega v. State, 285 Ga. 32, 33 (673 SE2d 223) (2009) ("'It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence.'" (citations omitted)).

Appellant disputes this conclusion only with respect to his conviction for the kidnapping with bodily injury of James Morrow, as to which he contends there was insufficient proof of asportation. The parties agree, and we concur, that the holding of Garza v. State, 284 Ga. 696, 697-703 (670 SE2d 73) (2008), applies in this case.[2] Pursuant to Garza, a court considers four factors in

---

[2] Garza applies because the crime alleged was committed prior to the July 1, 2009 effective date of the amendment to our kidnapping statute, see OCGA § 16-5-40 (b), and because Garza applies retroactively to crimes committed prior to that amendment. See Hammond v. State, 289 Ga. 142, 143-144 (710 SE2d 124) (2011).

10

determining whether the movement of the victim constitutes asportation sufficient to sustain a kidnapping conviction:

> (1) the duration of the movement; (2) whether the movement occurred during the commission of a separate offense; (3) whether such movement was an inherent part of that separate offense; and (4) whether the movement itself presented a significant danger to the victim independent of the danger posed by the separate offense.

Id. at 702. These factors are considered as a whole; it is not necessary that all four factors weigh in favor of asportation. See Inman v. State, 294 Ga. 650, 651 (755 SE2d 752) (2014).

Here, the duration of Mr. Morrow's movement was relatively short in time and distance, but the other factors all support a finding of asportation. Indeed, the evidence relating to the charge of kidnapping with bodily injury was substantially the same in the trial of Appellant's co-indictee Brown, and we have already held in his appeal that the Garza test was satisfied. See Brown, 291 Ga. at 753. See also Thomas v. State, 289 Ga. 877, 880 (717 SE2d 187) (2011) (finding the Garza test satisfied where the duration of the movement was short but the defendant forced the victims into a bathroom after robbing them, where their confinement made it easier to control them and increased the danger to them).

11

3.     Appellant asserts that the trial court erred in admitting Collins's testimony about Brown's statements to him the day before the crimes occurred under the exception to the hearsay rule for statements by co-conspirators. Under the old Evidence Code in effect at the time of Appellant's trial, the co-conspirator exception said: "After the fact of conspiracy is proved, the declarations by any one of the conspirators during the pendency of the criminal project shall be admissible against all."  Former OCGA § 24-3-5.[3]  Appellant does not appear to dispute that the evidence established a conspiracy to burglarize and commit related crimes at the McClure residence.  See OCGA § 16-4-8 ("A person commits the offense of conspiracy to commit a crime when he together with one or more persons conspires to commit any crime and any one or more of such persons does any overt act to effect the object of the conspiracy.").  Instead, he argues that Brown's out-of-court statements to Collins about wanting to rob Mr. Morrow were not admissible because they were made prior to the day the crimes were committed, October 15, which is when Appellant contends that the conspiracy was formed.

_____

[3] Appellant's trial occurred prior to January 1, 2013, the effective date of the new Georgia Evidence Code.  The admission of co-conspirator statements is now governed by OCGA § 24-8-801 (d) (2) (E).

12

As the trial court correctly recognized, this Court rejected a similar argument in Knight v. State, 239 Ga. 594 (238 SE2d 390) (1977), where we held that the phrase "pendency of the criminal project" used in former OCGA § 24-3-5 was broad enough to include "the creation of the original motive to commit the crime [and] the plan to commit it" as well as "the carrying out of the plan." Knight, 239 Ga. at 599. Because this motive and plan may be created first in the mind of a single co-conspirator, "before he obtains another or others to join with him in a conspiracy to carry it out," id., under former OCGA § 24-3-5, statements made by one conspirator were admissible in the trial of another co-conspirator to show their motive and intent "even though there is no clear proof there was a conspiracy in existence when [the statements were] made." Knight, 239 Ga. at 600. Accordingly, Brown's statements to Collins regarding his plan to steal money from the McClure house with the help of friends, including Appellant, were admissible under former OCGA § 24-3-5 even if they were made prior to the formation of the conspiracy. See Knight, 239 Ga. at 599-600. See also Blalock v. State, 250 Ga. 441, 441-442 (298 SE2d 477) (1983) (upholding the admission under former OCGA § 24-3-5 of statements made by a co-conspirator several months before the crimes occurred on the ground that

13

it did not matter whether the statements were made before or after the conspiracy was formed).[4] The trial court therefore did not err in admitting Collins's testimony about Brown's statements.

4. Appellant argues that the trial court erred by admitting evidence of his prior bad act, and that even if this prior act could be admissible as similar transaction evidence, the State failed to give written notice of its intent to use such evidence as required by Uniform Superior Court Rules 31.1 and 31.3 (A). We agree that this evidence was erroneously admitted, but we conclude that the error was harmless.

(a) At trial, the State sought to introduce evidence related to an armed robbery in Atlanta's Buckhead neighborhood in which Appellant had been implicated. One of the robbery victims, Brian Gage, testified that on October 5, 2002, ten days before the crimes at issue in this case were committed, he and several friends were robbed at gunpoint by a single assailant, and in the process,

---

[4] This Court recognized in Knight that former OCGA § 24-3-5 was broader than Federal Rule of Evidence 801 (d) (2) (E), which applied only to co-conspirator statements made during the course of the conspiracy. See Knight, 239 Ga. at 597, 599. We note that under our new Evidence Code, the rule governing co-conspirator statements now tracks the federal rule. See OCGA § 24-8-801 (d) (2) (E) (authorizing the admission of co-conspirator statements made "during the course . . . of the conspiracy"). The federal rule was revised in 2011 to say simply "during . . . the conspiracy" but that change was "intended to be stylistic only." Fed. R. Evid. 801 Advisory Committee's Note, 2011 Amendments.

his friend Dustin Papendick was shot in the chest. The description of the robber that Gage and two other victims gave the police right after the robbery was consistent with Appellant's appearance, although they were unable to identify Appellant in a photographic lineup later that month and Gage did not identify Appellant at trial. Gage did testify that the gunman had something shiny in his teeth, and officers found a set of silver teeth in Appellant's car when he was arrested in Texas. The gunman stole Gage's wallet, which contained his driver's license, credit cards, and gift cards. During a search of Appellant's parent's house after the McClure home invasion, officers found Gage's license, credit cards, and gift cards in Appellant's bedroom. An Atlanta police sergeant also testified that he recovered one .25-caliber Remington shell casing from the Buckhead robbery scene, and a firearm examiner testified that the four shell casings recovered from the McClure house and the shell casing recovered from the Buckhead crime scene were all fired from the same gun.

(b)     Appellant objected to the admission of this evidence. In arguments made outside the presence of the jury, the State maintained that it was not seeking to introduce the Buckhead robbery evidence as similar transaction evidence but rather to prove Appellant's identity. Because the State maintained

15

that the evidence was not similar transaction evidence, it had not provided notice of its intention to offer the evidence as required by Uniform Superior Court Rules 31.1 and 31.3 (A).[5] The State had, however, provided Appellant with the relevant police reports in pretrial discovery, included the witnesses on the State's witness list, and advised defense counsel that the State might seek to offer the evidence as the trial progressed. The trial court agreed with the State's position, ruling that the evidence was "not a similar transaction, but evidence of the crime charged."

However, Appellant was not charged with the Buckhead robbery in this case. Evidence about the Buckhead robbery was extrinsic to the crimes charged; it did not bear directly on Appellant's alleged conduct in this case, nor was it

---

[5] The version of Rule 31.1 in effect at the time of trial said that "[n]otices of the state's intention to present evidence of similar transactions or occurrences . . . shall be given and filed at least ten [10] days before trial unless the time is shortened or lengthened by the judge." Rule 31.3 said:

> (A) The prosecution may, upon notice filed in accordance with section 31.1 of these rules, request of the court in which the accusation or indictment is pending leave to present during the trial of the pending case evidence of similar transactions or occurrences.
> (B) The notice shall be in writing, served upon the defendant's counsel, and shall state the transaction, date, county, and the name(s) of the victim(s) for each similar transaction or occurrence sought to be introduced. Copies of accusations or indictments, if any, and guilty pleas or verdicts, if any, shall be attached to the notice. The judge shall hold a hearing at such time as may be appropriate, and may receive evidence on any issue of fact necessary to determine the request, out of the presence of the jury. The burden of proving that the evidence of similar transactions or occurrences should be admitted shall be upon the prosecution. The state may present during the trial evidence of only those similar transactions or occurrences specifically approved by the judge.
> . . .

16

intrinsic to, or inextricably intertwined with, the crimes at the McClure house. See generally Paul S. Milich, Georgia Rules of Evidence § 11:3 (2012-2013 ed.) ("Milich") (discussing the difference between intrinsic and extrinsic evidence).

The trial court cited Shell v. State, 210 Ga. App. 385 (436 SE2d 12) (1993), to support its ruling that the Buckhead robbery evidence was evidence of the crimes charged in this case. In Shell, however, the defendant was convicted of possession of cocaine with intent to distribute based on the seizure from his house of about 20 bags of crack cocaine during the execution of a search warrant; the search warrant was based on the defendant's attempt to sell cocaine to an undercover officer the night before. See id. The Court of Appeals correctly determined that the drug sale evidence was not a distinct "similar transaction" but rather was "evidence of the crime charged, . . . as it was part of the transaction which was the basis of the offense" of possession of cocaine with intent to distribute. Id. at 386. Here, the Buckhead robbery evidence was not part of any transaction that formed the basis for the charges against Appellant arising out of the McClure home invasion ten days later.

The trial court also said that the Buckhead robbery was not a similar transaction because it did not reflect a "signature" of Appellant. However, the

17

court viewed the admissibility of prior bad acts evidence too narrowly.[6] The Uniform Superior Court Rules use the phrase "similar transactions or occurrences," but that phrase is "really too narrow for the type of evidence that may be admissible." See Barrett v. State, 263 Ga. 533, n. 2 (436 SE2d 480) (1993), overruled in part on other grounds by Wall v. State, 269 Ga. 506, 508-509 (500 SE2d 904) (1998). As Professor Milich has pointed out in his treatise on Georgia evidence law, the phrase "similar transactions" is misleading for two reasons: (1) it is too narrow, because not all independent crimes, wrongs, or acts admissible under Rule 31.3 need to be similar to the charged crime; and (2) it "misleadingly suggests that similarity between the independent act and subject crime, by itself, is sufficient to admit the other act." Milich § 11:10.

"In general, evidence of independent offenses committed by a defendant is irrelevant and inadmissible in a trial for a different crime." Pareja v. State, 286 Ga. 117, 119 (686 SE2d 232) (2009). However, evidence of an independent bad act committed by the defendant may be admissible if the evidence is

---

[6] The record shows that this trial judge's incorrectly narrow view of admissible prior acts evidence was well-known to the prosecutor, which is apparently why the prosecutor sought to find another rationale for admitting the Buckhead robbery evidence rather than simply complying with the uniform rules.

"'substantially relevant for some purpose other than to show a probability that the defendant committed the crime on trial'" because he has a criminal character. Mullins v. State, 269 Ga. 157, 158 (496 SE2d 252) (1998) (citation omitted). "'[P]roof of a distinct, independent, and separate offense'" is admissible if there is "'some logical connection'" between the separate offense and the crimes charged "'from which it can be said that proof of the one tends to establish the other.'" Williams v. State, 261 Ga. 640, 641-642 (409 SE2d 649) (1991) (citation omitted). See also Young v. State, 281 Ga. 750, 751-752 (642 SE2d 806) (2007) (finding that the trial court went "astray" by concluding that there was no similarity between the prior crime and charged crime, explaining that the correct rule is that there must be a sufficient connection between the prior act and the crime charged). Under the old Evidence Code, evidence of an independent act could be offered to prove such things as motive, intent, bent of mind, course of conduct, intent, plan, scheme, or identity. See Rich v. State, 254 Ga. 11, 13 (325 SE2d 761) (1985); Cawthon v. State, 119 Ga. 395, 408-411 (46 SE 897) (1904).[7]

---

[7] Under the new Evidence Code, the admission of evidence of "other crimes, wrongs, or acts" at trials conducted after January 1, 2013, is governed by OCGA § 24-4-404 (b).

To determine admissibility of such evidence, the trial court must conduct a hearing pursuant to Rule 31.3 (B). At the hearing, the State bears the burden of making three affirmative showings:

> (1) the independent offense or act is offered "not to raise an improper inference as to the accused's character, but for some appropriate purpose which has been deemed to be an exception to the general rule of inadmissibility"; (2) the accused committed the independent offense or act; and (3) there is a "sufficient connection or similarity between the independent offense or act and the crime charged so that proof of the former tends to prove the latter."

Clay v. State, 290 Ga. 822, 838-839 (725 SE2d 260) (2012) (quoting Williams, 261 Ga. at 642).

> After the 31.3 (B) hearing, and before any evidence concerning a particular independent offense or act may be introduced, the trial court must make [an on-the-record] determination that each of these three showings has been satisfactorily made by the state as to that particular independent offense or act.

Williams, 261 Ga. at 642.

Here, the State offered the evidence of the prior Buckhead armed robbery for the appropriate purpose of proving Appellant's identity with respect to the crimes charged in this case, seeking to link him to the gun that was used in both shootings. The State also presented sufficient evidence to allow a finding that Appellant was involved in the Buckhead robbery and that the incidents were

20

sufficiently connected or similar for the robbery evidence to be admitted. However, before any evidence of an independent offense may be admitted into evidence, the State must give timely notice to the defendant or have the untimeliness excused by the court. See USCR 31.1; Ragan v. State, 264 Ga. 190, 192 (442 SE2d 750) (1994). In addition, before such evidence can be admitted, the court must hold the hearing required by Rule 31.3 (B) and make the three on-the-record findings required by Williams. See USCR 31.3 (B) (stating that the "judge shall hold a hearing"); Williams, 261 Ga. at 642. See also Moore v. State, 290 Ga. 805, 807 (725 SE2d 290) (2012); Barrett, 263 Ga. at 535. Thus, the trial court erred by admitting the Buckhead robbery evidence over Appellant's objection.

(c) Not all trial errors require reversal, however; "[a] defendant is entitled to a fair trial but not a perfect one, for there are no perfect trials." Sutton v. State, 238 Ga. 336, 338 (232 SE2d 569) (1977) (citation and punctuation omitted). We must therefore consider next whether the trial court's evidentiary error, which involves mistakes under Georgia's procedural rules and evidence law rather than any constitutional violation, was harmful to Appellant. "The test for determining nonconstitutional harmless error is whether it is highly probable

that the error did not contribute to the verdict." Lindsey v. State, 282 Ga. 447, 450 (651 SE2d 66) (2007). In determining whether trial court error was harmless, "we 'review the record de novo,'" and "we weigh the evidence as we would expect reasonable jurors to have done so" as opposed to viewing it all in the light most favorable to the jury's verdict. Boothe v. State, 293 Ga. 285, 289 (745 SE2d 594) (2013) (quoting Arizona v. Fulminante, 499 U. S. 279, 295 (111 SCt 1246, 113 LE2d 302) (1991)). In this case, we conclude that it is highly probable that the trial court's error in admitting the Buckhead robbery evidence did not contribute to the jury's guilty verdict.[8]

To begin with, the other evidence of Appellant's involvement in the McClure home invasion was overwhelming. It is recounted at length in Division 1 above, but to summarize, the properly admitted evidence included:

- Testimony by Collins, the murder victim's cousin, who told the police at the hospital just after the crimes that Brown told him the day before the home invasion that Brown was going

---

[8] Despite the dissent's suggestion that our holding breaks new ground in determining that an error in the admission of similar transaction evidence was harmless, this Court has reached the same conclusion in many prior cases, particularly where, as here, the other evidence of the defendant's guilt was overwhelming (and even when the Court applied, incorrectly, the harmless-beyond-a-reasonable-doubt standard applicable to constitutional errors). See, e.g., Jackson v. State, 281 Ga. 705, 706 (642 SE2d 656) (2007) (Hunstein, P. J.); Inman v. State, 281 Ga. 67, 71 (635 SE2d 125) (2006); Clark v. State, 280 Ga. 899, 900 (635 SE2d 116) (2006); Grimes v. State, 280 Ga. 363, 365 (628 SE2d 580) (2006); White v. State, 269 Ga. 74, 75 (495 SE2d 278) (1998) (Hunstein, J.).

to get friends including Appellant to help him rob the McClure house at night.

- Testimony by an eyewitness victim — Mr. Morrow — that Appellant was with Little on the porch just before they forced their way into the house.

- Detailed testimony from Little, a co-indictee who was testifying pursuant to a plea agreement but an obviously reluctant witness who bore personal animosity against the prosecutor, about Appellant's involvement in the crimes, as well as testimony from law enforcement officers that Little told them within a day of the crimes that Appellant and his brother were participants.

- Testimony from Appellant's cellmate, who had not received any benefit from the State, that Appellant said that he had accidentally shot some people that he was trying to scare when he went somewhere to get money.

- Testimony by officers that a small black car like Appellant's fled the neighborhood as they searched Appellant's house, and that Appellant and his brother fled to Texas the next day.

- Tearful testimony by Lee — the mother of Appellant's child and another reluctant witness — that Appellant called her about an hour after the crimes and asked her to provide him with a false alibi, hid out at her house with his brother after officers had come to their house, and later told her from jail not to cooperate with the investigation.

- Evidence that all of the shell casings and bullets recovered from the McClure home and the murder victim's body were .25-caliber Remington brand, and that two days after the crimes, police recovered an empty Remington brand .25-

23

caliber ammunition tray from underneath Appellant's bed.

- •    Telephone records corroborating the trial testimony against Appellant, including documentation of multiple calls between Appellant's cell phone and Little's home on October 15 both before and after the home invasion.

Indeed, the only real conflict in the evidence concerned whether Appellant or Little was the shooter; no evidence was presented that affirmatively suggested that Appellant was not a participant in the home invasion at the McClure house, leaving him, at a minimum, guilty as a party to the crimes committed there. See OCGA § 16-2-20.[9]

We must also consider, of course, the impact of the erroneously admitted evidence related to the prior Buckhead armed robbery. That evidence undoubtedly was somewhat damaging to Appellant, since it implicated him in another robbery in which a victim was shot with the same gun later used in the McClure home invasion and shootings.[10] But the link was only inferential,

_____

[9] The dispute over whether Appellant or Little was the shooter, as well as the evidence that the plan was to rob the house rather than commit a murder and the cellmate's testimony that Appellant said the shootings were an accident, explain why the jury could reasonably have found Appellant not guilty of malice murder but guilty of all the other crimes charged.

[10] As the dissent notes, the trial court, during its lengthy colloquy with the prosecutor and defense counsel about the admission of the Buckhead robbery evidence, said that the evidence was "extremely damaging to the defense" and "extremely prejudicial" – but the court then admitted the evidence over defense counsel's primary objection that the evidence was more prejudicial than probative, indicating that the court did not in the end consider the evidence unduly prejudicial. In

24

based on the presence in Appellant's bedroom 12 days later of one of the Buckhead victim's stolen possessions; the gun was never found and the Buckhead victims were unable to identify Appellant in photo lineups or at trial. Moreover, while Gage testified that the gunman in Buckhead was left-handed, like Appellant, Mr. Morrow identified Little in a photographic lineup as the man who shot him at the McClure house and testified that the shooter was right-handed. Finally, while the prosecutor argued to the trial court that he needed the Buckhead evidence admitted, he did not emphasize that evidence in closing arguments, not mentioning it at all in his initial argument and, in rebuttal closing, listing it as only one of the five different types of evidence that the jury could rely on to convict Appellant even if they chose to entirely disbelieve co-indictee Little's testimony.

Considering the trial record as a whole, and weighing the evidence as we believe that reasonable jurors would, we are convinced that the jury in this case would have found Appellant guilty of the same crimes had the Buckhead robbery evidence not been erroneously admitted. Moreover, compared to the

---

any event, in deciding whether a trial error was harmful, this Court does not defer to the trial court's assessment of the evidence but rather must examine the record de novo. See <u>Boothe</u>, 293 Ga. at 289.

overwhelming other evidence of Appellant's guilt, we do not view the Buckhead robbery evidence as particularly compelling or prejudicial. We therefore conclude that it is highly probable that the trial court's error in admitting the independent offense evidence did not affect the jury's verdict, and a new trial is not required.[11]

5. Appellant contends next that the trial court committed reversible error by allowing the prosecutor to refer to individual jurors by name, to make a "golden rule" argument, and to make an inappropriate demonstration during closing arguments.

(a) Appellant did not contemporaneously object at trial when the prosecutor first mentioned the names of individual jurors in closing arguments, and he therefore waived appellate review of this issue to that extent. See Ellington v. State, 292 Ga. 109, 143 (735 SE2d 736) (2012). In any event,

---

[11] In light of our conclusion that the error in admitting the independent offense evidence was harmless, we need not determine whether this error was purely procedural and thus could be addressed and potentially corrected on remand, see, e.g., Moore, 290 Ga. at 809-810, or whether it was instead a substantive error requiring reversal, see, e.g., Ragan, 264 Ga. at 192 (reversing where "the State did not provide the required notice and did not make any showing of the required connection between the independent offenses and the charged DUI or habitual violator offenses"); Williams, 261 Ga. at 643 (reversing where the trial court did not make the findings required by Rule 31.3 and "the state presented no evidence to the jury to establish [the necessary] similarity or connection").

however, Appellant has not established reversible error. In <u>Atlanta Stove Works, Inc. v. Hollon</u>, 112 Ga. App. 862 (146 SE2d 358) (1965), our Court of Appeals noted that "[i]t has been held in other jurisdictions that it is improper for counsel to single out a particular juror, address him by name, and personally appeal to him, . . . and such practice was disapproved by this court in the case of <u>Hudson v. State</u>, 26 Ga. App. 596, 600 (107 SE 94) [(1921)]." <u>Atlanta Stove Works</u>, 112 Ga. App. at 873 (citation omitted). See also <u>Burrell v. State</u>, 225 Ga. App. 264, 268 (483 SE2d 679) (1997) (stating, without citation of authority, that a solicitor's reference to a juror by name during closing arguments was "improper").[12] Although trial lawyers have always made arguments with the backgrounds of specific jurors in mind, we agree that remarks addressed to jurors by name during trial are almost always unnecessary and may put the fairness of the trial at risk; such remarks therefore should be avoided by counsel for all parties — particularly prosecutors in criminal cases — and may be precluded by the trial court in its discretion. See generally 75A AmJur2d Trial § 471 (collecting cases on the issue of addressing jurors individually or by

---

[12] Appellant did not cite these Georgia cases, or any apposite authority, to support his contention in his motion for new trial or in his brief to this Court.

27

name); <u>Norton v. State</u>, 293 Ga. 332, 335-336 (745 SE2d 630) (2013) (recognizing the trial court's discretion to control the manner in which counsel address the jury).

The mere mention of jurors by name does not, however, mandate reversal. Where, as occurred here, references to individual jurors are made incidentally in the course of illustrating points of law, rather than in an effort to draw the attention of the named jurors or the entire jury to facts not in evidence or to other improper considerations, it is within the trial court's discretion, after sustaining an objection to such comments, to deny a motion for mistrial. See <u>Atlanta Stove Works</u>, 112 Ga. App. at 873 (holding that the trial court did not abuse its discretion in overruling a motion for mistrial based on counsel's reference to a juror by name, where "the remarks were based on matters already legitimately appearing in the case and the naming of the juror was necessary in order to point out the alleged prejudicial fact of the common employment" of the juror with the other party's expert witness); <u>United States v. Kyle</u>, 257 F2d 559, 564 (2d Cir. 1958) ("The reference to two of the jurors by name by the prosecutor in the course of an argumentative illustration was innocuous . . . . It added nothing to the case and might have been better omitted but it was

28

certainly not 'injurious to the accused.'" (citation omitted)).[13]

Under these circumstances, therefore, we cannot say that the trial court would have abused its discretion in denying a mistrial, had a contemporaneous objection and motion for mistrial been made based on the prosecutor's references to jurors by name. Moreover, the prosecutor did not make an impermissible "golden rule" argument; in none of the passages identified by Appellant did the prosecutor urge the jurors to imagine themselves in the place of the victims during the crimes. See Ellington, 292 Ga. at 142-143.

(b) As for the allegedly improper demonstration, as the prosecutor began his rebuttal argument, he approached the jury box and said, "Mr. Turner, would you hand me that folder that's down at the bottom right there? There's

---

[13] In Hudson, the prosecutor clearly argued improperly in closing by citing, with no evidentiary support, a "rumor" he had heard about a juror being a friend of the defendant who would not convict him and then, pointing to a juror named Jim Barron, said, "Jim Barron, I don't believe that is true about you." 26 Ga. App. at 600. Nevertheless, the Court of Appeals found no abuse of discretion in the denial of a mistrial, where the trial court, after contemporaneous objection, gave a curative instruction and rebuked the prosecutor. See id. at 600-601. Likewise, in Burrell, the prosecutor clearly argued improperly during the closing of a DUI trial by referring to the specialized experience of a juror who worked in a liquor store, saying: "You can look at somebody who's had too much to drink and you can tell. Mr. Lee [the juror] can tell you that because every day in his job he sees people that he can't sell alcohol to because they don't – they've had plenty . . . ." 225 Ga. App. at 268. Nevertheless, the court held that the trial court's refusal to grant a mistrial on that basis was not reversible error, and further that the issue had been waived. See id. at 268-269. Here, the prosecutor referred to two jurors by name as part of the allegedly improper demonstration discussed in Division 5 (b) below – which related to the point that the questions of lawyers are not evidence – and he referred to two jurors by name in connection with his explanation of the elements of kidnapping.

not a folder down there, is there? Ms. Brown, don't look for a folder." Having heard defense counsel's closing, the prosecutor's point was that questions asked by counsel do not constitute evidence; only the witnesses' answers are evidence. The trial court overruled Appellant's objection, saying that the prosecutor "was making a point by illustration." Appellant has failed to show that the trial court abused its discretion by permitting this demonstration of a legal principle. Cf. Norton, 293 Ga. at 335-336 (finding no abuse of discretion where the trial court permitted the prosecutor to present a demonstration during closing argument using an 18-inch piece of wood to represent the sawed-off shotgun that the defendant claimed that he and the victim had struggled over).

6. Finally, Appellant asserts that his trial counsel — two highly qualified and experienced criminal defense lawyers — provided constitutionally inadequate assistance by failing to make certain objections during the prosecutor's closing arguments. To succeed on this claim, Appellant was required to show both that his counsel were professionally deficient in failing to make the objections and that there is a reasonable probability that the verdict would have been more favorable to him if the objections had been made. See Strickland v. Washington, 466 U. S. 668, 687, 694 (104 SCt 2052, 80 LE2d

30

674) (1984). Whether to object to a particular part of a prosecutor's closing argument is a tactical decision, see Westmoreland v. State, 287 Ga. 688, 695-696 (699 SE2d 13) (2010), and counsel's decision not to make an objection must be patently unreasonable to rise to the level of deficient performance, see Westbrook v. State, 291 Ga. 60, 64 (727 SE2d 473) (2012). But the reviewing court need not determine if counsel's performance was actually deficient if the court instead determines that the deficiency alleged did not cause prejudice. See Baker v. State, 293 Ga. 811, 814 (750 SE2d 137) (2013).

Appellant suggests first that his trial counsel were professionally deficient in failing to object (and move for a mistrial) when the prosecutor referred to individual jurors by name. However, even assuming that this failure was deficient rather than strategic, Appellant has not shown that the trial court was required to grant a mistrial, see Division 5 (a) above, particularly in light of the overwhelming evidence of Appellant's guilt, see Division 4 (c) above, and thus he has not shown prejudice from the assumed deficiency. See Reed v. State, 291 Ga. 10, 16-17 (727 SE2d 112) (2012).

Appellant also contends that his trial counsel were ineffective in failing to object when the prosecutor allegedly suggested that the jury should reach a

verdict based on how the community feels rather than on the law and the evidence. Appellant asserts that the following part of the prosecutor's argument was improper:

> You bring your life experiences to this courtroom, come from different backgrounds, different parts of the country, different work. Some of you are raised in Douglasville, some of you weren't. Some of you had small businesses. Some of you are retired. Some of you are raising families. Some of you have raised your families. It's a cross section of people and that's the way it's suppose[d] to be. It's suppose[d] to be that way. It's suppose[d] to be that way because a verdict in a criminal trial in this case is suppose[d] to be a reflection of what the community feels, what the people in this community feel about what happens in their community. And that's why you're sitting there with your different experiences.

Both of Appellant's trial lawyers testified at the motion for new trial hearing, and they agreed that lead counsel Jimmy Berry was primarily responsible for making any objections during closing arguments. When asked why he did not object, Mr. Berry explained that he did not think that the prosecutor had crossed the line into an impermissible "golden rule" argument, that he did not think he could make a strong objection on this ground, and that he said something similar to the jury in his own closing argument. He further explained that he does not like to object much during closing arguments because it can hurt his credibility by making the jury think that he is trying to hide

32

something or is "just trying to pick at" opposing counsel. We see nothing objectionable in the prosecutor's argument at issue, and Appellant certainly has not shown that it was patently unreasonable for his trial counsel not to object to that argument. Accordingly, he has not shown ineffective assistance of trial counsel in this regard. See Humphrey v. Lewis, 291 Ga. 202, 217 (728 SE2d 603) (2012) ("'[A] failure to object to permissible arguments cannot establish deficient attorney performance.'" (citation omitted)).

Judgment affirmed. All the Justices concur, except Thompson, C. J., Benham and Hunstein, JJ., who dissent.

HUNSTEIN, Justice, dissenting.

I respectfully dissent because the majority's holding of harmless error under the circumstances presented here eviscerates the requirements of Uniform Superior Court Rules 31.1 and 31.3 and improperly permits the introduction of evidence of independent acts of the accused without the procedural protections we have insisted are mandatory. As we have recognized, evidence of an independent act committed by the accused is "highly and inherently prejudicial" because it raises "an inference that an accused who acted in a certain manner on one occasion is likely to have acted in the same or in a similar manner on another occasion." Williams v. State, 261 Ga. 640, 641 (2) (a) (409 SE2d 649) (1991). Evidence of an independent act directly, and inappropriately, places the accused's character in issue and invites the jury, wittingly or unwittingly, to adjudicate the guilt of the accused based on evidence of an independent act rather than that of the offense charged in the indictment. Id. at 641-642. This is why we have held that the trial court must hold a hearing pursuant to Rule 31.3 (B) before any evidence of independent offenses or acts may be admitted at trial. See id. Compliance by the State and the trial court with Rules 31.1 and

31.3 is not optional; it is mandatory. Id. at 642 ("[B]efore any evidence of independent offenses or acts may be admitted into evidence, a hearing *must* be held pursuant to Uniform Superior Court Rule 31.3 (B).") (emphasis supplied); Barrett v. State, 263 Ga. 533, 535 (2) (436 SE2d 480) (1993) ("compliance with . . . Rules 31.1 and 31.3 for all prior acts . . . is mandatory"), overruled on other grounds, Wall v. State, 269 Ga. 506 (2) (500 SE2d 904) (1998); USCR 31.1 (notice of the State's intention to present evidence "*shall* be given") (emphasis supplied); USCR 31.3 (B) ("judge *shall* hold a hearing") (emphasis supplied).

Given the evidence presented here, I believe it is highly probable that the errors — the State failing to provide proper notice pursuant to Rules 31.1 and 31.3 (B) and the trial court failing to conduct a Rule 31.3 (B) hearing and make affirmative findings on the record — did contribute to the verdict. The matching shell casings directly linked the Buckhead armed robbery to the crimes at the McClure home and the evidence raised the inference that Peoples was involved both in the Buckhead armed robbery and in the crimes charged, particularly as a shooter. The jury heard evidence that Morrow identified Little from a photographic lineup as the man who shot him. With the shooter of Morrow identified, this leaves for the jury the open question of who shot J.R.

2

Once the Buckhead armed robbery evidence was admitted, the jury may well have reasonably decided that Peoples shot J.R. by drawing the impermissible inference that because Peoples committed the Buckhead armed robbery, he also committed the crimes in this case.

The majority purports to "weigh the evidence as we would expect reasonable jurors to have done so." Yet, as even the trial court acknowledged, the evidence of the Buckhead armed robbery was "extremely damaging to the defense" and "extremely prejudicial." Once the Buckhead armed robbery evidence was admitted, People's character was tainted, and he was no longer tried solely for the crimes charged in the indictment.

Moreover, although the majority notes that Peoples had notice of the Buckhead armed robbery evidence – via relevant police reports, witnesses on the State's witness list, and the State's notification that it might seek to offer the evidence – this does not comply with the specific notice requirements of Rules 31.1 and 31.3 (B). "The purpose of timely advance notice is to allow the defendant to investigate the validity, relevancy, and other aspects of admissibility of the prior offenses." Rodriguez v. State, 211 Ga. App. 256, 258 (4) (a) (439 SE2d 510) (1993). The notice requirement is a further safeguard

3

protecting against the improper admission of an accused's character, and the State's intention to use such evidence certainly will affect the defense's trial strategy. Thus, I disagree with the majority and would find that it was highly improbable that the trial court's error in admitting this evidence did not contribute to the jury's verdict.

Under the majority's analysis, I question when an error for failure to comply with Rule 31 would ever *not be* harmless.

> [B]y gradual evolution, the rule that the character of a defendant in a criminal case can not be put in issue or attacked has been gradually chiseled away and finally located in the shadow of other principles, the application of which has been deemed necessary for the enforcement of the criminal laws; and while the principle still lives in theory as a memory of the past, [the majority's holding today makes the rule] of little practical effect in the actual trial of cases.

Green v. State, 172 Ga. 635, 640 (3) (158 SE 285) (1931). I believe that the proper course in this particular case is to find that the error was not harmless and to reverse. See, e.g., Johnson v. State, 275 Ga. 508 (3) (570 SE2d 292) (2002) (reversible error where there was no Rule 31.1 notice, trial court did not conduct hearing regarding admissibility of prior crimes in compliance with Rule 31.3 (B), and it was highly improbable that the error did not contribute to the

4

verdict); Williams, 261 Ga. at 642-643 (failure by the trial court to make the essential preliminary determination as to whether the State was introducing similar transaction evidence for the appropriate purpose required reversal of conviction); see also Ragan v. State, 264 Ga. 190 (2), (3) (442 SE2d 750) (1994) (failure to give notice and make the affirmative showings at a Rule 31.3 (B) hearing required reversal).

For all of these reasons, I respectfully dissent. I am authorized to state that Chief Justice Thompson and Justice Benham join in this dissent.

Decided April 10, 2014.

Murder. Douglas Superior Court. Before Judge McClain.

J. Scott Key, for appellant.

David McDade, District Attorney, James A. Dooley, Emily K. Richardson, Assistant District Attorneys, Samuel S. Olens, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Meghan H. Hill, Assistant Attorney General, for appellee.