310 Ga. 365
FINAL COPY

S20A0718. MIDDLETON v. THE STATE.

BOGGS, Justice.

Appellant Christopher Lamont Middleton challenges his 2018 conviction for felony murder for the shooting death of Wesley Bryant. Appellant contends that the evidence was insufficient to support his conviction, that the count of the indictment charging him with felony murder based on armed robbery was void because it did not allege the essential elements of armed robbery, and that the trial court erred in refusing to charge the jury on self-defense. Seeing no reversible error, we affirm.[1]

---

[1] Bryant was killed on November 22, 2016. On March 29, 2017, a Gwinnett County grand jury indicted Appellant for malice murder, three counts of felony murder, armed robbery, aggravated assault with a deadly weapon, and possession of a firearm by a first offender probationer. At a trial from August 20 to 24, 2018, the jury acquitted Appellant of malice murder but found him guilty of two counts of felony murder and the underlying charges of armed robbery and aggravated assault. The trial court then entered an order of nolle prosequi on the firearm possession count and the associated felony murder count, which had been bifurcated for trial. On August 27, 2018, the trial court sentenced Appellant to serve life in prison for felony murder based on armed robbery. The felony murder verdict based on aggravated assault,

1. The evidence at trial showed the following. On November 11 and 12, 2016, Appellant was communicating via Facebook with an associate named Shawn "Face" Thomas, who was trying to find a gun for Appellant to purchase. Thomas messaged Appellant about different types of guns that were available and their prices, and Appellant responded, "I gotta make something shake now." Thomas messaged back saying, "told you I was going to find you one," and Appellant replied, "I'm going to try to make a play."

Bryant worked a regular job in a warehouse but also sold marijuana on the side. On Tuesday, November 22, 2016, someone listed in his cell phone only as "Check" sent Bryant a text message at 10:02 a.m. saying, "Gotta play for two zips." Bryant replied that

which the trial court purported to merge, was actually vacated by operation of law, see *Stewart v. State*, 299 Ga. 622, 627 (791 SE2d 61) (2016), and the armed robbery and aggravated assault verdicts merged, see *Long v. State*, 287 Ga. 886, 888-889 & n.2 (700 SE2d 399) (2010). On August 29, 2018, Appellant filed a motion for new trial, which he amended with new counsel on January 15 and March 7, 2019. After an evidentiary hearing, on April 29, 2019, the trial court denied the motion. Appellant filed a timely notice of appeal. Following the trial court's transmission of the record, on January 7, 2020, the case was docketed in this Court to the April 2020 term. On March 6, 2020, the State filed an untimely request for oral argument, which this Court denied. See Supreme Court Rule 51 (1) ("No extensions of the time for filing a request for oral argument will be allowed.").

2

he was at work. Check asked what time Bryant got off and said that he would "just tell him [to] hit u up when u get off." Bryant responded that he got off at "5," and Check said that he would tell the person to contact Bryant "at 6." Bryant told Check to make sure to "tell him to text first."

At 6:08 p.m., Appellant sent Bryant a text message introducing himself as "[B]lack" and saying that "[C]heck told me to text u about them 2." Appellant and Bryant arranged to meet up in a pharmacy parking lot in Gwinnett County shortly after 7:30 p.m. When Bryant arrived, he backed his car into a parking space across from the pharmacy's well-lit entrance. Bryant had a Glock .45, which he got from Anthony Tucker, who had known Bryant since middle school and who still saw Bryant four or five times a week. According to Tucker, the Glock .45 was Bryant's only gun, and every time that Tucker was in Bryant's car, including the previous Saturday, Bryant had the Glock .45 tucked between the driver's seat and the center console.

At 7:37 p.m., Bryant opened a text message from Appellant saying that Appellant was walking up to the pharmacy. At 7:40 p.m., a pharmacy surveillance camera recorded Appellant walking casually up to Bryant's car, opening the front passenger-side door, and getting inside. A little more than a minute later, the surveillance camera recorded Appellant getting out of Bryant's car holding a gun in his right hand, closing the door, and running away with what appeared to be items stuffed into the left pocket of his jacket. A few moments later, the surveillance camera recorded Bryant on the driver side of his car walking a few steps and dropping his cell phone before collapsing onto the pavement.

At around 7:45 p.m., Gwinnett County Police Department (GCPD) officers were dispatched to the pharmacy in response to a 911 call. An officer found Bryant lying on his back, shaking, with blood coming out of his mouth. Bryant was not breathing, and his pulse was faint. Paramedics soon arrived and took Bryant to the hospital, where he was pronounced dead. Bryant had no marijuana or firearms on his person and a single dollar bill in his wallet. The

4

police found two empty 9mm cartridge cases in Bryant's car but no marijuana, firearms, or money. Bryant's Glock .45 was never located.

The medical examiner who performed the autopsy on Bryant's body determined that Bryant had been shot twice. One bullet entered his right side and fractured a rib before coming to rest in his left flank, and the other bullet entered the top back of his right shoulder and traveled in a downward trajectory through several vital organs before coming to rest in his small intestine. Based on the entry points of the bullets, their wound paths through the body, the number of shots fired, and the physical evidence that both shots were fired at close but not contact range, the medical examiner concluded that Bryant's injuries were not self-inflicted. A GBI firearms and tool mark examiner determined that the two bullets removed from Bryant's body during the autopsy and the two cartridge cases recovered from his car were all 9mm and that the bullets could not have been fired from a Glock pistol.

Corporal Micah Hegwood of the GCPD was assigned as the lead

detective. He obtained the access code to Bryant's cell phone from Bryant's family and saw the text message exchange between Appellant and Bryant that led up to the shooting. Corporal Hegwood tried to ping Appellant's cell phone, but it had been turned off, and within a couple of hours of the shooting, Appellant contacted his cell phone provider and changed his cell phone number.

On the day after the shooting, Appellant started making arrangements to leave Gwinnett County. Two days later, he was in Augusta and messaged a contact on Facebook to say that he "came early," and the next day, he messaged his girlfriend saying, "please understand I had to go right away." Several days later, he sent his girlfriend a message saying that he was going to be back soon but had to "stay low" because he was "all on the news." He spent the next several weeks in Augusta.

On January 12, 2017, Appellant was located at a hotel in Gwinnett County and taken into custody, and Corporal Hegwood and another detective interviewed him at police headquarters. The interview was video recorded, and the recording was later played for

the jury. At first, Appellant said that he was unaware that there had been a shooting at the pharmacy, denied seeing anything about it on the news, and claimed that he sold his cell phone on the day of the shooting "at probably like 10:00 a.m." The detectives told Appellant that they had evidence proving that he was not being honest with them and left him alone in the interview room. After about five minutes, Appellant knocked on the door and said that he wanted to tell the detectives what happened because he did not commit a murder, and the detectives returned to the interview room.

Appellant then changed his story. Appellant admitted that he knew about the shooting at the pharmacy, that he did "cancel" his cell phone, and that he got a new phone the day after the shooting. Appellant said that on the evening of the shooting, he was at Face's apartment near the pharmacy with Face, Check, and another man when they decided to chip in together to buy marijuana. Appellant claimed that he gave his cell phone to Face to arrange the purchase; that the four of them walked together to a gas station across the street from the pharmacy; that he went into the gas station

7

convenience store to buy cigarillos while Face, Check, and the other man went across the street to get the marijuana; that he heard gunshots across the street and saw Face, Check, and the other man running from the pharmacy parking lot; and that he then met up with Face, Check, and the other man back at Face's apartment. According to Appellant, Face said that someone got shot, and Appellant responded by asking where the marijuana was. Appellant claimed that they had seven grams of marijuana and that he did not ask for his money back because "I did get my weed." The detectives told Appellant that they knew that Face had gotten Appellant a gun, which Appellant denied, stating that he did not have the money to buy a gun. He acknowledged that he was "looking for a gun" but claimed that he never found one. The detectives told Appellant that surveillance footage from the pharmacy contradicted his story.

After a break, Appellant changed his story again, telling the detectives, "I'm fixing to tell you the truth right now. Have a seat." This time, Appellant admitted that he went alone to the pharmacy to meet Bryant to purchase the marijuana and that he was in

Bryant's car when Bryant was shot. According to Appellant, Check said that a friend had a "zip" of marijuana, which sells for $185, but Appellant had only $75 or $85, so Appellant said that he would go up and "get a seven," meaning seven grams of marijuana. Appellant denied sending any of the texts from his cell phone to Bryant leading up to the shooting, stating that Face and Check sent all the texts. Appellant claimed that when he got into Bryant's car, Bryant handed him the marijuana before any money was exchanged; he asked if Bryant was trying to rip him off; and Bryant said that he did not have a scale to weigh the marijuana and accused Appellant of trying to act like Appellant was in a gang.

Appellant admitted that he got aggressive with Bryant but said that it was because Bryant got aggressive with him. Appellant stated that Bryant pulled a 9mm gun from his side and pointed it at Appellant, that Appellant grabbed Bryant's hand and the gun, and that the gun "went off" several times. Appellant also stated that his finger never touched the gun's trigger, although he said at one point that his hand "might have" pushed Bryant's finger while it was on

9

the trigger. Appellant was adamant that he did not shoot Bryant and that Bryant shot himself. Appellant admitted taking the 9mm gun and Bryant's marijuana when he got out of the car, claiming that the gun was in his left hand and the marijuana was in his right hand. Corporal Hegwood tried to get Appellant to tell him the location of the 9mm gun because it was connected to the murder. Appellant insisted that he did not know where it was, although he said later in the interview that Face did not have it.

Appellant did not testify or present any other evidence. The defense theory was that Bryant had a 9mm pistol in his car where he usually kept his Glock .45 and pulled it on Appellant, that Appellant grabbed Bryant's hand to keep Bryant from shooting him, and that during a struggle over the gun, the gun twice fired accidentally, striking Bryant. The trial court instructed the jury on accident but declined Appellant's written request to instruct the jury on justification based on self-defense, citing the Court of Appeals' decision in *McClure v. State*, 347 Ga. App. 68 (815 SE2d 313) (2018)

(*McClure I*), which this Court later vacated. See *McClure v. State*, 306 Ga. 856 (834 SE2d 96) (2019) (*McClure II*).[2]

When viewed in the light most favorable to the verdicts, the evidence presented at trial and summarized above was sufficient as a matter of constitutional due process to authorize a rational jury to find Appellant guilty beyond a reasonable doubt of felony murder based on armed robbery. See *Jackson v. Virginia*, 443 U. S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979). See also *Eberhart v. State*, 307 Ga. 254, 262 (835 SE2d 192) (2019) (explaining that the jury is free to reject a claim of accident, and that whether the acts charged were committed "by accident [is] a question for the jury"); *Vega v. State*, 285 Ga. 32, 33 (673 SE2d 223) (2009) ("'It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence.'" (citation omitted)).

---

[2] OCGA § 16-2-2 says: "A person shall not be found guilty of any crime committed by misfortune or accident where it satisfactorily appears there was no criminal scheme or undertaking, intention, or criminal negligence." As we have previously explained, "This accident defense applies where the evidence negates the defendant's criminal intent, whatever that intent element is for the crime at issue." *State v. Ogilvie*, 292 Ga. 6, 9 (734 SE2d 50) (2012).

2. Appellant claims that his felony murder conviction on Count 2 of the indictment must be vacated because that count did not allege the essential elements of the underlying offense of armed robbery. This claim is a challenge to the form of the indictment. See *Reed v. State*, 291 Ga. 10, 11 (727 SE2d 112) (2012) (holding that a claim that a felony murder count fails to allege the essential elements of the predicate offense "is, in essence, a special demurrer seeking greater specificity with regard to the predicate felony" (citation and punctuation omitted)). Appellant waived this claim by failing to raise it before trial in a timely filed special demurrer. See id. See also OCGA §§ 17-7-110 ("All pretrial motions, including demurrers and special pleas, shall be filed within ten days after the date of arraignment, unless the time for filing is extended by the court."), 17-7-113 ("All exceptions which go merely to the form of an indictment or accusation shall be made before trial.").

3. Appellant also claims that the trial court erred in relying on the Court of Appeals' decision in *McClure I*, which this Court later vacated in *McClure II*, to deny his written request to instruct the

jury on the affirmative defense of justification based on self-defense. The State responds that an instruction on self-defense was not adjusted to the evidence, because there was not even slight evidence that Appellant shot Bryant in self-defense. Pretermitting these issues, we conclude that the error, if any, was harmless.

"'The test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict.'" *Smith v. State*, 299 Ga. 424, 432 (788 SE2d 433) (2016) (citation omitted). "In determining whether trial court error was harmless, we review the record de novo, and we weigh the evidence as we would expect reasonable jurors to have done so as opposed to viewing it all in the light most favorable to the jury's verdict." *Peoples v. State*, 295 Ga. 44, 55 (757 SE2d 646) (2014) (citation and punctuation omitted). Where a claim of justification based on self-defense "'is supported by only the slightest evidence and . . . is inconsistent with the defendant's own account of the events . . . ,' the failure to give a charge on the defense generally will be harmless." *Guerrero v. State*, 307 Ga. 287, 288-289 (835 SE2d 608) (2019)

13

(citation omitted).

Although generally "a person is justified in using force which is intended or likely to cause death or great bodily harm . . . if he . . . reasonably believes that such force is necessary to prevent death or great bodily injury to himself[,]" OCGA § 16-3-21 (a), "[a] person is not justified in using" such force "if he . . . [i]s attempting to commit, committing, or fleeing after the commission or attempted commission of a felony." OCGA § 16-3-21 (b) (2). Thus, a jury instruction on justification based on self-defense would have included an admonition that Appellant was *not* justified if he was committing or attempting to commit a felony. By his own account, Appellant was purchasing marijuana, or at least attempting to purchase marijuana, when Bryant was shot.[3]

Purchasing marijuana is a felony, regardless of the amount of marijuana involved. See OCGA § 16-13-30 (j) (making it a felony to

---

[3] Appellant claimed that the gun went off accidentally and denied shooting Bryant, although that was inconsistent with forensic evidence.

purchase marijuana).[4] See also *State v. Jackson*, 271 Ga. 5, 5 (515 SE2d 386) (1999) ("Under OCGA § 16-13-30 (j) (2), conviction of this crime [i.e., purchasing marijuana] would result in felony sentencing even though the amount of marijuana that [the defendant] allegedly purchased is less than one ounce."); *Johnson v. State*, 296 Ga. App. 697, 698 (675 SE2d 588) (2009) ("[T]he quantity of marijuana purchased is *not* an element of the crime of purchasing marijuana." (emphasis in original)). Thus, even under Appellant's own account of the events, he was attempting to commit or committing a felony at the time of the shooting. Accordingly, it is highly probable that any error in denying Appellant's request to instruct the jury on justification based on self-defense did not affect the verdicts and was

___

[4] OCGA § 16-13-30 (j) says:

(1)   It shall be unlawful for any person to possess, have under his or her control, manufacture, deliver, distribute, dispense, administer, purchase, sell, or possess with intent to distribute marijuana.

(2)   Except as otherwise provided in subsection (c) of Code Section 16-13-31 [i.e., trafficking marijuana] or in Code Section 16-13-2 [i.e., possession of one ounce or less of marijuana], any person who violates this subsection shall be guilty of a felony and, upon conviction thereof, shall be punished by imprisonment for not less than one year nor more than ten years.

therefore harmless. See *Bannister v. State*, 306 Ga. 289, 292 (830 SE2d 79) (2019) ("There was also evidence that Appellant was engaged in a felony drug deal at the time of the shooting, which would preclude his self-defense claim, as the jury was properly instructed." (citing OCGA § 16-3-21 (b) (2))); *Starks v. State*, 304 Ga. 308, 312 (818 SE2d 507) (2018) ("Because there is no dispute that [the defendant] shot [the alleged victim] while committing two felonies, he could not claim self-defense, and the evidence therefore was overwhelming."). See also *Reynolds v. State*, 275 Ga. 548, 549 (569 SE2d 847) (2002) ("Even under [the defendant's] version of the events, he was a party to an armed robbery and thus, the evidence did not show that he was justified in the use of deadly force. Because the evidence did not support the charge, the trial court did not err in failing to give it.").

*Judgment affirmed. All the Justices concur, except Warren, J., not participating.*

Decided October 19, 2020 – Reconsideration denied November 16, 2020.

Murder. Gwinnett Superior Court. Before Judge Conner.

*Frances C. Kuo*, for appellant.

*Daniel J. Porter, District Attorney, Christopher L. Lewis, Samuel R. d'Entremont, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway GeneralBurton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Michael A. Oldham, Assistant Attorney General,* for appellee.