### 42931. EVANS v. THE STATE.
(342 SE2d 684)

SMITH, Justice.

A Jones County jury found the appellant, Johnny Frank Evans, guilty of two counts of murder, two counts of kidnapping with bodily injury, aggravated battery, aggravated assault, burglary, and armed robbery. The state sought the death penalty for the two murder counts, but the jury recommended a life sentence for each count, to be served consecutively with life sentences for the kidnapping with bodily injury counts and the armed robbery count, ten years for the aggravated assault count and the burglary count, and twenty years for the aggravated battery count. The appellant raises nine issues on appeal. We affirm.[1]

While taking his date home on the night of May 8, 1984, Rodney Turk noticed two large objects in the middle of Highway 441. He quickly dropped off his date and returned to the spot where he had seen the objects. There, he found the bodies of a young woman and a young girl. They had been shot and stabbed, and they were dead. He immediately located his father, who in turn called the police.

The police identified the young woman as Pam Sikes and the young girl as her five-year-old daughter, Katie Lancaster. When they arrived at Mrs. Sikes' home, they found that a glass panel on the side of the front door had apparently been shattered initially by a bullet, then forced in by hand. They found blood on some pieces of the panel.

The interior of the house showed no signs of a struggle. Mrs. Sikes' purse lay undisturbed on the piano bench in the living room. The police did, however, find bloodstains on the light switch in Katie's room, on the floor in the kitchen and the dining room, and on the front porch. They also found a pair of women's panties, which subsequently were found to be spotted with semen, in Mrs. Sikes' bedroom.

The Sikes' blue Grand Prix was found early in the morning on May 9. Someone had steam-cleaned the interior of the car. One witness at trial testified that he had seen a man, whose race he could not determine, cleaning out the car at a car wash. Another witness testi-

---

[1] The crime was committed on May 8, 1984. The Jones County jury returned its verdict of guilty on March 2, 1985. A motion for new trial was filed March 28, 1985, and the transcript of evidence was filed May 1, 1985. The motion for new trial was heard and denied on June 20, 1985. Notice of appeal was filed July 10, 1985. The record was docketed in this Court on November 9, 1985, and argued January 23, 1986.

fied that a car closely resembling the Grand Prix had nearly run him off of the road late at night on May 8. He thought that there were two men in the car.

Investigators for the state discovered a number of fingerprints and palmprints on the car. Two belonged to Katie Lancaster and one belonged to Doug Sikes, the brother of Mrs. Sikes' husband of six months, Dan Sikes. Two or three of the identifiable prints were not matched with any known print. The investigators also found bloodstains in the car.

On the morning of May 9, John Bly drove three of his employees, including the appellant, from Eatonton to Atlanta to do construction work on I-285. As they left Eatonton, around five o'clock in the morning, they saw the Putnam County Sheriff in front of the jail. After one of the employees, Gene Andrews, noted that he had heard ambulances the night before, they decided that "something done went on wrong." When they reached the construction site, the appellant, at Bly's suggestion, called back to Eatonton to discover what had happened the night before.

He told Bly, after calling home, that Mrs. Sikes and her daughter had been killed. The appellant's mother and sister, the people he contacted by phone, testified at trial that they did not tell the appellant who had been killed. The appellant told an investigator on the case that a fellow employee, Frank Farley, told him who had been murdered. He said that Farley's wife had heard about the murders and the identity of the victims late the night of the murders. Farley's wife testified that she had discovered the victims' identities the night of the murders and that she had told Farley early the next morning before he went to work. Farley denied hearing his wife tell him about the murders, and he denied telling the appellant about the murders although he did not deny that she could have told him about the murders as he slept.

The police questioned the appellant, who lived less than a half-mile from the victims, on May 11, May 12, and May 14. His statements as to his whereabouts and actions on the night of the murders proved ambiguous and inconclusive. All testimony at trial as to his whereabouts and actions on the night of the murders proved ambiguous and inconclusive. While questioning the appellant on May 11, the police noticed that he had a number of small cuts on his right hand. He claimed to have received the cuts while working with cement, but they suspected that he may have received them pushing his fist through the shattered glass panel at the Sikes' residence.

Laboratory tests of the blood found on the glass panel, in the kitchen and the dining room, on the front porch of the Sikes' home, and in the Grand Prix matched the appellant's blood type and enzyme tests. The blood found at those locations did not match the

blood of Dan Sikes, who received $110,000 as beneficiary of Mrs. Sikes' life insurance policy, or Doug Sikes, who returned to Eatonton from North Georgia Tech on the night of the murders after being expelled from school. Certain characteristics of the semen found in Mrs. Sikes' panties also matched the appellant's blood.

During the course of their investigation, the police discovered that the appellant's mother, with whom he lived, was missing a .38 Taurus pistol, which she usually kept under her mattress. State firearms experts determined that bullets found in the Sikes' home and the bullet that killed Mrs. Sikes were probably fired from a Taurus .38 caliber pistol.

1. The first three issues raised by the appellant relate to the sufficiency of the evidence.

The state's serological expert testified that tests run on blood found in the house and in the car excluded 99.5% of the population of Georgia, but did not exclude the appellant. Of the suspects in the case, only the appellant was not excluded. The state's ballistics expert testified that in all probability, the bullets that killed the victims were fired from a Taurus .38 caliber pistol, the specific make and model of the appellant's mother's missing pistol. In addition, the jury could have concluded that the appellant knew the identity of the victims before anyone told him their identity, and that he received the cuts on his hand from breaking into the Sikes' home. This evidence adequately supports the conviction under the standard established in *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. The next two issues that the appellant raises concern the testimony of the state's serological expert.

(a) The appellant contends that the state's expert did not lay an adequate foundation to support any findings as to percentages of the state population possessing certain blood types and enzymes. He charges that the expert did not reveal the body of persons from which the statistics were determined or show why that body of persons provided an adequate sample base for an ultimate determination.

The expert did state that the statistics were compiled from random samples sent in to the crime lab. She described the origins of the samples, and testified that the resulting statistics were cross-checked against Red Cross and FBI statistics. The expert's description of the compilation of the data base supports the trial court's decision to allow the expert to testify as to statistics developed from that base. The appellant possessed the opportunity to question the compilation of the data base through cross-examination. See also OCGA § 24-9-82.

(b) The appellant next contends that as the expert was not qualified as an expert in mathematics or probability, she should not have been allowed to testify as to the percentage of the population possessing all of the characteristics found in the blood discovered in the

house and the car, and the appellant's blood. Since simple multiplication may be an integral part of many scientific processes and determinations, we find that the trial court did not err in allowing the state's expert to testify as to ultimate percentages compiled from an adequate data base.

3. The appellant contends that the trial court erred in allowing a GBI agent to testify in rebuttal for the state that Dan Sikes expressed anguish upon hearing of his wife's death. The agent's testimony indirectly rebutted an inference made in the appellant's case that Dan Sikes murdered, or arranged the murder of his wife. We find no error. *City of Atlanta v. Hampton*, 139 Ga. 389 (77 SE 393) (1913).

4. The appellant asserts that the trial court should have declared a mistrial when the prosecutor attempted to simultaneously lead his witness and introduce the appellant's character into evidence.

In questioning the appellant's mother on direct examination, the prosecutor, discussing the appellant, stated, "Then if he said he was in bed at 9:30, he lied, didn't he?" The appellant's mother replied that he could have been in bed. The trial court denied the appellant's motion for a mistrial.

The prosecution's question, a syllogism followed by a request that the witness confirm the accuracy of the syllogism certainly conveyed the desired response, and thus constituted a leading question. *James v. State*, 215 Ga. 213 (109 SE2d 735) (1959). The answer given by the appellant's mother to the leading question, however, rendered harmless the trial court's error in allowing the prosecutor to ask the leading question.

As the prosecutor noted in contesting the appellant's motion, the central thrust of the "question" was that the appellant lied to the police when he told them that he was in bed at 9:30 on the night of the murders. The prosecution's question, as it related to the facts of this case, thus, did not impermissibly introduce the appellant's character into evidence.

5. The appellant charges that the trial court should have declared a mistrial when one of the state's witnesses who was also a suspect in the case, Dan Sikes, stated that he had passed a polygraph test.

Dan Sikes made this statement during cross-examination by the prosecutor in spite of the fact that the parties had agreed prior to trial to caution their witnesses to avoid any mention of polygraph exams. Immediately upon hearing the statement, the trial court sua sponte instructed the jury to disregard any reference to a polygraph examination. The parties agree that the prosecution did not intentionally draw out the reference to the examination.

Though the statement by Dan Sikes certainly prejudiced the appellant's case and was certainly not admissible, the trial court's swift, emphatic action in instructing the jury to ignore the statement suffi-

ciently remedied the situation. We find that the trial court did not abuse its discretion. *Sheppard v. State*, 235 Ga. 89, 91 (218 SE2d 830) (1975); *Everett v. State*, 253 Ga. 359 (320 SE2d 535) (1984).

6. Finally the appellant contends that the trial court should have excluded from evidence his first statement to the police. The appellant claims that his initial statement to the police was involuntary, since he was intoxicated at the time that he made the statement.

At the Jackson-Denno hearing, held to determine the voluntariness of the statement, the appellant stated that he had consumed seven cans of malt liquor on the afternoon of his interrogation. He testified that his mother told him that the police wanted to see him when he returned from work, and that he told his mother that he did not want to talk to them because he was "high." He remembered telling the police that he was high, but he could not clearly remember anything else that he told them.

The investigators who questioned the appellant testified at the hearing that the initial questioning session was brief. They stated that they had a policeman bring the appellant to the station because the appellant did not have a car, but that although they read the appellant his Miranda rights, he was not in custody. They realized soon after the interview began that the appellant had alcohol on his breath, so, out of "an abundance of caution," they halted the interview and sent the appellant home.

The evidence presented at the Jackson-Denno hearing supports a finding that the appellant was lucid, if a bit loose, at the time of his first questioning, that he was not in custody and was free to leave at his will, and that his statement was voluntary for the purposes of OCGA § 24-3-50.

*Judgment affirmed. All the Justices concur, except Hunt, J., not participating.*

DECIDED MAY 13, 1986.

*Charles D. Newberry, G. B. Moore III*, for appellant.
*Joseph H. Briley, District Attorney, Michael J. Bowers, Attorney General*, for appellee.