S11A0807. GANDY v. THE STATE.

(718 SE2d 287)

CARLEY, Presiding Justice.

After a jury trial, Appellant Craig Wayne Gandy was found guilty of felony murder, armed robbery, burglary, and aggravated assault. The trial court entered judgments of conviction on the guilty verdicts and sentenced Appellant to life imprisonment for felony murder, a concurrent 20-year term for burglary, and a concurrent 20-year term for aggravated assault. The armed robbery charge merged into the

felony murder conviction. Appellant appeals after the denial of a motion for new trial.*

1. Construed most strongly in support of the verdicts, the evidence shows that, on October 18, 2007, the victims, Mr. and Mrs. James Moore, hired Appellant Craig Wayne Gandy and Jim Cloud to travel down to Niceville, Florida, in order to assist them with their food preparations at the Boggy Bayou Mullet Festival. They worked the festival together all day Friday, Saturday, and Sunday, and stayed three nights in the same hotel room. On Monday, October 22, the four returned to the victims' home in Moultrie, Georgia. Once there, Appellant and Cloud performed the required cleanup tasks, and the victims went into the house to count the money earned at the festival. After Appellant and Cloud were paid around $400 each, they left the victims' residence.

According to Cloud, who testified at trial, Appellant and Cloud went to Appellant's mother's house where Jessica Hernandez, Appellant's fiancée, was also present. At some point later that night, Appellant called Joshua Peterson, who came to Appellant's mother's house in a white Monte Carlo with a gun. Appellant told his mother and Ms. Hernandez that he was taking Cloud home, and then he and Cloud left with Peterson. The three men went to the local Wal-Mart and bought gloves and ski masks. They then drove to the victims' house where Appellant and Cloud broke into the back door by using a tire tool to force the door open.

The sleeping victims awoke to find two masked men standing in their bedroom. One had a gun and the other had a blue baseball bat that was owned by Mr. Moore. Mr. Moore recognized the man with the baseball bat as Cloud because of the way he was holding the bat. When the man with the gun asked where the money was, Mr. Moore immediately recognized his voice as that of Appellant. Mr. Moore disclosed that the money was in a safe and then told the men where to find the safe. At this time, Mrs. Moore said, "Craig, why are you doing this?" Immediately when he heard his name, Appellant began firing the gun. He shot Mr. Moore four or five times and Mrs. Moore five times, killing her. When an officer later arrived at the victims' home, he asked Mr. Moore what happened, and Mr. Moore stated that Appellant and Cloud had shot them.

After the shooting, Appellant and Cloud grabbed the safe and

---

* The crimes occurred on October 23, 2007, and the grand jury returned the indictment on December 18, 2007. The jury found Appellant guilty on August 13, 2008. The trial court entered the judgments of conviction and sentences on August 26, 2008. A motion for new trial was filed on September 5, 2008, amended on March 26, 2010, and denied on June 30, 2010. Appellant filed the notice of appeal on July 27, 2010. The case was docketed in this Court for the April 2011 term and submitted for decision on the briefs.

fled the house. Appellant entered the waiting car driven by Peterson, but Cloud ran to a nearby store where he was picked up soon after. On the way back to Appellant's mother's house, their car ran out of gas. They were picked up and driven home by Timothy Walker, who saw them on the side of the road with the white Monte Carlo. Later that day, Walker recognized Appellant's picture on a local news organization's web page.

According to Appellant's mother and Ms. Hernandez, the men returned to Appellant's mother's house around 5:15 a.m. to pick up Ms. Hernandez. After buying gas for the Monte Carlo, they drove to Ms. Hernandez's house where Appellant changed clothes. After splitting the money and throwing the empty safe into the nearby woods, Peterson left in the Monte Carlo and Appellant and Cloud left in Appellant's car. When the police arrived at Ms. Hernandez's house later that day, they found the stolen safe in a ditch approximately 50 yards from the house.

After leaving Ms. Hernandez's house, Appellant's car broke down by some railroad tracks in nearby Calhoun County. After receiving a call concerning a suspicious vehicle, police officers located the car and saw two men fleeing into the woods. The officers caught and arrested Cloud first and then, after a longer chase, caught and arrested Appellant, who had about $4,000 in cash on his person. The evidence was sufficient for a rational trier of fact to find Appellant guilty beyond a reasonable doubt of the crimes for which he was convicted. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. Appellant contends that the trial court erred by failing to grant a mistrial when Cloud, Appellant's co-indictee, identified Joshua Peterson in court at the request of the State, which resulted, claims Appellant, in Peterson testifying by his presence. Since Peterson subsequently asserted the Fifth Amendment, Appellant argues that this identification violated his Sixth Amendment right to confront witnesses.

In *Davis v. State*, 255 Ga. 598, 604 (7) (340 SE2d 869) (1986), the primary defense of the appellant was that his girlfriend committed the murder. In response, the State brought the girlfriend into the courtroom to be identified in front of the jury because the prosecutor felt that she was too small to have the physical power to murder the victim by choking. This Court found that since the girlfriend's size was part of the State's case, letting the jury see her did not constitute error. *Davis v. State*, supra at 603 (7). The *Davis* court further held that, because the girlfriend asserted her Fifth Amendment privilege and refused to answer any relevant questions, the appellant's Sixth Amendment right to confront witnesses could not have been violated. *Davis v. State*, supra at 603-604 (7).

*Davis* controls the present case. During cross-examination, defense counsel pressed Cloud about Peterson's alleged role in the murder and repeatedly attempted to implicate Peterson as the actual shooter, arguing that Appellant was being framed. Defense counsel also questioned Cloud regarding any physical similarities between Appellant and Peterson, attempting to show that the victims could have mistaken Peterson for Appellant as the masked gunman. In order to rebut this theory, the State had Cloud identify Peterson in court so that the jurors themselves could ascertain whether Appellant and Peterson were similar in appearance. Moreover, defense counsel called Peterson as a witness and, before Peterson asserted his Fifth Amendment right against self-incrimination, he admitted that at one point he was formally charged as a co-defendant in the case. Therefore, pretermitting whether the identification of Peterson by Cloud "rendered [Peterson] a 'witness against him' within the meaning of the Sixth Amendment . . . , in this case, any such right was defeated by [Peterson's] determination to assert the Fifth Amendment and refuse to answer any relevant questions." *Davis v. State*, supra.

3. Appellant contends that the trial court erred by declining to declare a mistrial when Cloud, a State's witness, testified that he had taken a polygraph examination. On redirect examination, the State questioned Cloud as to whether he was sure that Appellant was the shooter. Cloud responded, "I'd swear on my life. I took a lie detector test actually to prove it." Defense counsel immediately objected and moved for a mistrial. The trial court denied the mistrial, emphasizing that the mention of the polygraph was unsolicited by the State. The trial court did, however, issue a curative instruction to the jury to disregard any reference to a polygraph test. "[T]he trial court's prompt curative instructions to the jury to disregard [Cloud's] statement was sufficient to prevent the testimony from having any prejudicial impact. [Cit.]" *Durden v. State*, 274 Ga. 868, 870 (5) (561 SE2d 91) (2002). See also *Lance v. State*, 275 Ga. 11, 22 (23) (560 SE2d 663) (2002); *Evans v. State*, 256 Ga. 10, 13 (5) (342 SE2d 684) (1986); *Lynn v. State*, 231 Ga. 559, 560 (2) (203 SE2d 221) (1974).

Moreover, "[i]t is highly improbable that [Cloud's] remarks influenced the outcome of the case, in view of the strong weight of the evidence against . . . [A]ppellant. . . . [Cit.]" *Crawford v. State*, 256 Ga. 585, 587 (2) (351 SE2d 199) (1987). Aside from the testimony of Cloud, the victims identified Appellant as the gunman, Appellant's mother and fiancée confirmed that he was with Cloud, an admitted participant, immediately before and after the murder, Appellant was arrested by police while fleeing with Cloud with $4,000 in cash, and the safe stolen from the victims' house was found in a ditch 50 yards from the house in which Appellant then lived. "Under the circum-

stances of this case, the trial court did not abuse its discretion in refusing to grant a mistrial." *Crawford v. State*, supra.

4. Appellant contends that his trial counsel rendered ineffective assistance of counsel and thus the trial court erred by failing to grant a new trial.

> Under *Strickland v. Washington*, 466 U. S. 668 (104 SC 2052, 80 LE2d 674) (1984), "(t)o prevail on a claim of ineffective assistance of trial counsel, [Appellant] bears the burden of showing both that trial counsel was deficient and that he was prejudiced by the deficiency. (Cit.)" [Cit.] In order to establish prejudice, "a defendant (must) show 'a reasonable probability sufficient to undermine confidence in the outcome that, but for counsel's alleged unprofessional errors, the result of the proceeding would have been different.' (Cits.)" [Cit.] When reviewing an ineffective assistance claim, "we accept the trial court's factual findings and credibility determinations unless clearly erroneous, but we independently apply the legal principles to the facts. (Cits.)" [Cit.]

*Cannon v. State*, 288 Ga. 225, 229 (6) (702 SE2d 845) (2010).

(a) Appellant first claims that his trial counsel rendered ineffective assistance by failing to move to suppress all evidence and testimony regarding the identification by the victims of Appellant as the masked gunman and the identification by Walker of Appellant as one of the men he gave a ride to in the early morning hours after the murder. Relying on *Neil v. Biggers*, 409 U. S. 188 (93 SC 375, 34 LE2d 401) (1972), Appellant contends that the identification of Appellant by the victims should have been excluded because it was the result of a highly suggestive identification procedure, namely that, since the victims knew that Cloud and Appellant left their house together only hours earlier, their identification of Appellant as the masked man with a gun was tainted by their prior identification of Cloud as the masked man with the baseball bat. Appellant further contends that Walker's identification testimony should have been excluded as it was also the result of a suggestive identification procedure because on the day of the murder, Walker saw a photograph of Appellant on a local news organization's web page that identified him as a suspect in the crime. "However, the principle expressed in *Neil v. Biggers* deals with the suggestiveness of an identification procedure used by police, and applies only to state action. [Cits.]" *Semple v. State*, 271 Ga. 416, 417 (2) (519 SE2d 912) (1999). See also *Lyons v. State*, 247 Ga. 465, 466-467 (277 SE2d 244) (1981).

With regard to the victims' identification of Appellant during the

commencement of the crime as the masked gunman, there "is no indication of suggestive police activity of any kind" and the issue is merely one of the credibility of eyewitnesses to the incident which "must be resolved by the trier of fact. [Cits.]" *Lyons v. State*, supra at 467. Mr. Moore testified at trial, and thus "matters such as the basis for [Mr. Moore's] identification of [Appellant] and his ability to view [Appellant] at the crime scene[ ] were simply subjects for cross-examination. . . . [Cit.]" *Semple v. State*, supra at 419 (2). The admission of the identification statement by Mrs. Moore, now deceased, was made the subject of a motion in limine filed by defense counsel, and thus there can be no error as counsel did not fail to seek the exclusion of the admission of her identification.

With regard to Walker's identification of Appellant as one of the men he gave a ride to on the morning of the incident, "[t]here is no evidence that the police or any other state actors were involved with [broadcasting Appellant's] photograph or otherwise suggesting an identification to [Walker]. . . ." *Semple v. State*, supra at 418 (2). Again, this is merely an issue of the credibility of an eyewitness to the events surrounding the crime, and since Walker testified at trial, the jury was able to assess his credibility. Accordingly, Appellant has failed to show that defense counsel was ineffective by failing to move to suppress the above-referenced identification evidence and testimony.

(b) Appellant also contends that his trial counsel was ineffective by failing to assert that Georgia's statutory and constitutional provisions requiring the service of mandatory minimum sentences before consideration for parole regardless of age constitutes cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution. As a result of OCGA § 17-10-6.1 (c) (1), Appellant must serve a minimum of 30 years in prison before he will be eligible for parole. Relying on *Graham v. Florida*, ___ U. S. ___, ___ (III) (B) (130 SC 2011, 176 LE2d 825) (2010), Appellant, who was 20 years old at the time of the crime, contends that requiring him to serve 30 years before parole at such a young age when his brain has not yet fully matured is cruel and unusual as it is essentially a "death" sentence due to the length of time and the old age at which Appellant will finally have a chance to be free. However, in *Graham*, the Supreme Court of the United States held that the Eighth Amendment "prohibits the imposition of a life without parole sentence on a juvenile offender who did not commit homicide." *Graham v. Florida*, supra at ___ (III) (D). In the present case, Appellant is not a juvenile, he committed a homicide, and he was sentenced to a term of years without the possibility of parole and not life without the possibility of parole. Therefore, *Graham* is inapplicable.

Moreover, this Court has previously rejected a challenge by a 19-year-old offender to his death sentence on the grounds that "he may have possessed the same attributes of a juvenile offender that prompted the United States Supreme Court to prohibit the imposition of the death penalty on offenders under age 18. *Roper v. Simmons*, 543 U. S. 551, 574 (III) (B) (125 SC 1183, 161 LE2d 1) (2005)." *Rogers v. State*, 282 Ga. 659, 660 (2) (a) (653 SE2d 31) (2007). In *Rogers*, we stated that the Supreme Court "recognized that 'a line must be drawn' and '(t)he age of 18 is . . . the age at which the line for death eligibility ought to rest.' [Cit.]" *Rogers v. State*, supra. Therefore, as Appellant was 20 years old at the time he committed the crime and was sentenced to a term of years rather than death, any consideration for Eighth Amendment purposes in the present case of incomplete brain maturation due solely to age is inappropriate.

Accordingly, as Appellant has failed to show that trial counsel's performance was deficient, his ineffective assistance claims are without merit.

*Judgment affirmed. All the Justices concur.*

DECIDED NOVEMBER 21, 2011.

*John G. Wolinski*, for appellant.

*J. David Miller, District Attorney, Brian A. McDaniel, Assistant District Attorney, Samuel S. Olens, Attorney General, Mary Beth Westmoreland, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Dana E. Weinberger, Assistant Attorney General,* for appellee.