**FIFTH DIVISION**
**MCFADDEN, C. J.,**
**MCMILLIAN, P. J., and SENIOR APPELLATE JUDGE PHIPPS**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules

**March 13, 2020**

# In the Court of Appeals of Georgia

A19A2016. REDDING v. THE STATE.

MCMILLIAN, Presiding Judge.

In July 2011, a Fulton County grand jury indicted Javorris Redding, along with five co-indictees, on one count of participation in criminal street gang activity, three counts of armed robbery, one count of aggravated assault with a deadly weapon, and one count of possession of a firearm during the commission of a felony.[1] Each of Redding's co-indictees accepted a plea bargain prior to trial. Redding chose to proceed to trial in August 2012 and was convicted on all counts except aggravated assault with a deadly weapon (Count 5). The trial court sentenced Redding to a total of 35 years, with 25 years to be served in confinement. Redding now appeals the

---

[1] Redding was also charged with possession of a firearm by a convicted felon (Count 7), but the State later nolle prossed that charge.

denial of his motion for new trial, as amended,[2] and asserts the following enumerations of error: (1) the evidence was insufficient to support his convictions; (2) the trial court erred in denying his motion to suppress; (3) the trial court erred in admitting evidence over objection; (4) he received ineffective assistance of counsel; and (5) the trial court erred in denying his motion for mistrial. For the reasons that follow, we find no error and affirm.

Viewed in the light most favorable to the jury's verdict, the record shows that on the night of April 13, 2011, Bryan Stewart and Kevin Culbreath drove around to a few clubs in Culbreath's car, a black Camaro with red stripes and "Forgiatos," top-of-the-line wheels. When they stopped at a gas station to purchase beer, they met two women who agreed to accompany them to a nearby hotel room at approximately 4:00 a.m. When Stewart realized that the women were not interested in having sex that night, he and Culbreath left to pick up Chantal Jackson, a friend of his, from a club where she worked. After getting something to eat, the three of them returned to the

---

[2] We note that Redding timely filed his motion for new trial in 2012. A hearing was then scheduled in April 2014, but the parties requested a continuance. The trial court then issued a scheduling order for supplemental briefing. Unfortunately, however, the case was not reset for a hearing until the trial court located Redding's pending motion through a search of its docket in 2018. At that point, the trial court set a status conference in an attempt to get the case back on track for a hearing on the motion for new trial, and a hearing was later held in January 2019.

hotel room, where the two women were still waiting. Culbreath ended up on one bed with the two women who were smoking marijuana, and Stewart slept in the other bed with Jackson.

Culbreath stayed up watching a movie and noticed one of the women kept texting someone. When the women got up to leave, one of them stopped at the dresser where the hotel key was laying and fumbled with something there and made a movement as if she were putting something in her purse. Shortly after the women left, Culbreath heard a rattling at the door and then saw the handle start to turn. He jumped up and ran to the door, but as he tried to push the door closed, two men with guns fought their way in. The men spun him around and hit him on the head with a gun. Culbreath went down to the ground, and one of the men put a foot on his neck and told him not to move or he would kill him. They took Culbreath's pants off him and found the keys to his car. One of the men went over to the other bed and woke up Stewart and Jackson.

Stewart testified at trial that he fell asleep until he felt somebody tugging on his pants leg. He initially thought that Culbreath was just "horsing around," but then he saw two men in the room pointing pistols at them. Stewart was able to get a good look at the man standing over Culbreath until the men told him to turn his head. They

3

took Jackson's earrings and cell phone, as well as Stewart's pants, glasses, jacket, and cell phone before stealing Culbreath's car, which had Jackson's bag containing her clothing and money in it. After the men left, Stewart saw that Culbreath was bleeding heavily from his head.

Culbreath and Stewart called the police and gave their statements before asking Culbreath's brother to pick them up so they could get some clothing. Culbreath then called his friends and local tire shops to put the word out that his car had been stolen. In the meantime, Culbreath, his brother, and Stewart drove around to "all the hot spots" and eventually located his car at a car shop parked next to several other cars, including a white Charger and another black Camaro with "stock" parts. There were people standing around outside the shop, but when they saw Culbreath and Stewart, they ran and the white Charger took off. While Culbreath circled the block to try to catch the men who were running, he called police to let them know he had found his stolen car. Culbreath and his friends could not catch the men, and as they were headed back to the Camaro, they stopped when they saw police pull over the white Charger and take the men who were in the car into custody.[3] Stewart alerted police that he was

---

[3] Redding, who was in the car, was arrested after law enforcement learned that Redding had an outstanding warrant on an unrelated charge.

able to recognize one of the men taken into custody as one of the men who had robbed them earlier that morning.

After Redding was taken into custody, police recovered two guns from the white Charger, a 9mm Ruger and a .45 Ruger. When Culbreath and Stewart went to the police station to give a statement, they told police that the car shop was very well known to them and that the man who owned the shop was probably going to take the expensive rims off Culbreath's car and put them on the "stock" Camaro. Police showed Stewart a photographic lineup, and he was able to identify Redding as one of the men who had robbed them. Stewart also identified Redding at trial.

One of the responding detectives also interviewed another suspect who had been detained, Garrett Nash. Nash was the owner of the "stock" Camaro and admitted that he had wanted to purchase the wheels off a stolen car. Police located $4,500 on his person. Nash explained that he had received a text message regarding the wheels, but claimed he did not know who the message was from. He did, however, allow the detective to search his phone. The detective found a text message that said "Say Doe dis Keyon lil brotha I got dem Forgi for u call me asap." The text came through at 6:58 a.m. The armed robbery had been reported at 6:24 a.m. The detective then looked through Nash's call log and was able to match the name "Redding J" to the

5

number that had sent the text message.[4] He then obtained the call logs and text messages for that number on that day.

The State also introduced the testimony of an expert on criminal street gangs who explained the various criteria that law enforcement use to determine whether someone is a member of a gang. He testified that a gang called "30 Deep" was formed in 2004 in the Mechanicsville neighborhood in southwest Atlanta as a Bloods "set."[5] Its members have committed a large number of crimes, both in and outside their community, including armed robberies, car thefts, carjackings, and violent assaults. Another group called "Goodfellaz" began in the prison system in the early 2000s. Although that group denies that it is a traditional gang, it is structured after a "mob style" criminal organization to generate money through criminal activity. The founding member of Goodfellaz was Javorris Redding's older brother, George Redding, known as "Keon," who police believe was also the leader of 30 Deep. Police discovered that a number of 30 Deep gang members were also members of the Goodfellaz.

---

[4] He also obtained the call logs and text messages for the number associated with "Redding J" for that day.

[5] 30 Deep itself has several subsets with different names, including Da Robbin Crue and Yung Robbin Crew.

6

Another gang investigator explained that in the early part of 2011, she had been investigating the shooting of a star witness just prior to the trial of a known 30 Deep member, Jonathan Redding. As part of her efforts to collect gang intel, she downloaded and maintained a file of photographs and videos of known 30 Deep members from online social media sites, showing various gang signs, nicknames, and terminology. Several of these photographs were admitted into evidence at trial, including ones that showed Javorris Redding and known 30 Deep members holding up gang signs. The State also admitted a Goodfellaz video depicting, among other known gang members, George "Keon" Redding, Jonathon Redding (who was on trial for murder at that time), and Javorris Redding wearing a red bandana associated with the Bloods gang.

As part of a separate investigation, police had initiated three wire taps in March 2011 to record conversations between members of 30 Deep and Goodfellaz. Police were able to determine that two of the telephone numbers belonged to Redding and that he went by the nickname "Moblife." Copies of the recordings were admitted into evidence, and portions of the conversations between Redding and several other known gang members were played for the jury at trial. Multiple recordings included discussions about getting guns and committing various crimes, including robbery.

While investigating the armed robbery reported in this case, a gang expert with the Atlanta Police Department determined that Redding was a member of both 30 Deep and Goodfellaz. This determination was based, in part, on the fact that Redding had previously been arrested along with other known members of 30 Deep and entered a guilty plea on participation in a criminal street gang. In addition, Redding had several fairly prominent tattoos indicating gang membership, most notably a "GF" tattoo on his throat associated with the Goodfellaz. After Redding was convicted, this appeal followed.

1. In his first five enumerations of error, Redding challenges the sufficiency of the evidence. When reviewing the sufficiency of the evidence on appeal, we determine "whether a rational trier of fact could have found the defendant guilty beyond a reasonable doubt." *Thomas v. State*, 300 Ga. 433, 436 (1) (796 SE2d 242) (2017). In doing so, we do not "reweigh evidence or resolve conflicts in testimony; instead, evidence is reviewed in a light most favorable to the verdict, with deference to the jury's assessment of the weight and credibility of the evidence." (Citation and punctuation omitted.) Id.

a. Redding first asserts that the evidence was insufficient to prove his conviction for criminal street gang activity because the armed robberies charged in

Counts 2, 3, and 4 were an "isolated incident," and the State failed to prove that the armed robberies were linked with gang activity.[6] We disagree.

Count 1 of the indictment charged Redding with the offense of participation in criminal street gang activity

> for that said accused . . . did unlawfully, while associated with the Bloods, a criminal street gang, conduct and participate in criminal gang activity through the commission of crimes of violence and weapon offenses, as enumerated in paragraph (1) (J) of Code Section 16-15-3, to wit: Armed Robbery; Aggravated Assault with a Deadly weapon; Possession of a Firearm During the Commission of a Felony; Possession of a Firearm by a Convicted Felon, as set forth in Counts 2 through 7 of this Indictment . . .

To prove that Redding violated OCGA § 16-15-4, the State was required to show three things:

> (1) that [he was], in fact, associated with a criminal gang, (2) that [he] committed a predicate act of criminal gang activity, namely [armed robbery, aggravated assault with a deadly weapon, and possession of a

---

[6] OCGA § 16-15-4 (a) provides that "[i]t shall be unlawful for any person employed by or associated with a criminal street gang to conduct or participate in criminal gang activity through the commission of any offense enumerated in paragraph (1) of Code Section 16-15-3." Pertinently, OCGA § 16-15-3 (1) (J) includes "[a]ny criminal offense . . . that involves violence, possession of a weapon, or use of a weapon, whether designated as a felony or not . . . ."

firearm during the commission of a felony], and (3) that the commission of the predicate act was intended to further the interests of the criminal gang.

(Punctuation omitted.) *Zamudio v. State*, 332 Ga. App. 37, 39-40 (2) (771 SE2d 733) (2015).

Here, the State presented evidence showing that the Atlanta Police Department's Gang Unit considered Redding a member of both 30 Deep and Goodfellaz. This determination was made, in part, based on evidence that Redding displayed gang signs alongside other known gang members, wore a red bandana to represent his association with a gang, had a tattoo on his neck associated with the Goodfellaz gang, and had previously pleaded guilty to participation in criminal street gang activity.

In addition, the State produced telephone recordings between Redding and other gang members discussing violent crimes, including robbery and assault. And finally, gang investigators testified that 30 Deep and Goodfellaz are known for committing armed robberies and car thefts and that Goodfellaz was organized to generate money through criminal activity. Specifically, in this case, shortly after committing the armed robberies, Redding texted Nash, offering to sell the type of

wheels on Culbreath's stolen Camaro. This evidence was sufficient to authorize the jury to find Redding guilty beyond a reasonable doubt of participation in criminal street gang activity. See *Stripling v. State*, 304 Ga. 131, 134 (1) (b) (816 SE2d 663) (2018).

b. Redding next asserts that the evidence was insufficient to sustain his convictions for Count 2 (armed robbery of Culbreath), Count 3 (armed robbery of Stewart) and Count 6 (possession of a weapon during the commission of a felony).[7] According to Redding, this case boils down to Stewart's identification, and because Stewart made his initial identification while Redding was in custody during an "impromptu show up," any subsequent identifications were tainted, including his identification of Redding from a photo lineup and in-court identification at trial.

We first note that Stewart's identification was not the only evidence against Redding. Moreover, there is no evidence of a police-initiated show up. The record

---

[7] "A person commits the offense of armed robbery when, with intent to commit theft, he or she takes property of another from the person or the immediate presence of another by use of an offensive weapon, or any replica, article, or device having the appearance of such weapon." OCGA § 16-8-41 (a). And under Georgia law, it is also a crime for "[a]ny person [to] have on or within arm's reach of his or her person a firearm . . . during the commission of, or attempt to commit . . . [a]ny crime against or involving the person of another . . . and which crime is a felony." OCGA § 16-11-106 (b) (1).

shows that Stewart and Culbreath were at the scene of their own accord and happened to see police place Redding in custody. Stewart recognized Redding at that time and volunteered this information to the police. Where "[t]here is no indication of suggestive police activity of any kind in the identification[,]" the issue becomes the credibility of the eyewitness to be determined by the trier of fact. *Lyons v. State*, 247 Ga. 465, 467 (277 SE2d 244) (1981) ("The due process protection of the Fourteenth Amendment to the United States Constitution protects the citizens against state action rather than against citizen action. In order for the Fourteenth Amendment to come into play in an identification procedure, state action must be involved.") (citation omitted). See also *Gandy v. State*, 290 Ga. 166, 171 (4) (a) (718 SE2d 287) (2011) (where there was no evidence that police or other state actors were involved with suggesting identification, it is an issue of eyewitness credibility, which the jury was able to assess when the witness testified at trial).

In addition, even if Stewart's initial identification were the result of impermissibly suggestive police conduct, it would not necessarily render his subsequent identifications inadmissable.[8] See *Escober v. State*, 279 Ga. 727, 729 (2)

---

[8] We likewise reject Redding's attempt to question the veracity of Stewart's identification. "[I]t is the jury's role to resolve conflicts in the evidence and the credibility of witnesses." (Citation omitted.) *Tolbert v. State*, 282 Ga. 254, 256 (1)

12

(620 SE2d 812) (2005) ("if an out-of-court identification is impermissibly suggestive, an in-court identification is admissible if it does not depend upon the prior identification, but has an independent origin") (citation and punctuation omitted). Stewart saw Redding standing over Culbreath in the hotel room from a close distance, which was an independent basis for identifying Redding.

Accordingly, because the trial court properly permitted Stewart to identify Redding, coupled with other evidence at trial, including Redding's text message to Nash and the recovery of two guns from the car in which Redding was stopped, we find that the evidence was sufficient for the jury to convict Redding for the armed robbery of Culbreath and Stewart and possession of a firearm during the commission of a felony.

c. Redding separately asserts that the evidence was insufficient to support his conviction for the armed robbery of Jackson because Jackson testified that she was asleep until Stewart woke her up to tell her that they just got robbed. However, one of the responding officers testified that while Jackson initially said that she did not see anything, she later said that she had been woken up by Stewart as the armed robbery was happening. Culbreath also testified that while one of the men was

(647 SE2d 555) (2007).

13

holding him down, the other man went to the other bed where Stewart and Jackson had been sleeping and woke them up. Culbreath explained that if anyone could have gotten a look at the men, it would have been Stewart and Jackson. Although the evidence was conflicting as to whether Jackson was awake during the robbery, the jury is tasked with resolving such conflicts.[9] "[T]he fact that the jury resolved the conflicts in the evidence or credibility of the witnesses adversely to [Redding] does not render the evidence insufficient." *Jackson v. State*, 306 Ga. 706, 708 (1) (a) (832 SE2d 809) (2019). See also *Esprit v. State*, 305 Ga. 429, 437 (826 SE2d 7) (2019) (under old and current Evidence Codes, "a prior inconsistent statement of a witness who takes the stand and is subject to cross-examination is admissible as substantive evidence, and is not limited in value only to impeachment purposes") (punctuation omitted). Accordingly, this enumeration of error is without merit.

2. Redding next asserts that the trial court erred in denying his motion to suppress. When reviewing a trial court's ruling on a motion to suppress, we are guided by three fundamental principles:

---

[9] Peculiarly, the State argues that there was no evidence that Jackson was awake during the robbery even though Culbreath and an officer testified that she was woken up.

First, when a motion to suppress is heard by the trial judge, that judge sits as the trier of fact. The trial judge hears the evidence, and his findings based upon conflicting evidence are analogous to the verdict of a jury and should not be disturbed by a reviewing court if there is any evidence to support them. Second, the trial court's decision with regard to questions of fact and credibility must be accepted unless clearly erroneous. Third, the reviewing court must construe the evidence most favorably to the upholding of the trial court's findings and judgment.

(Citations and punctuation omitted.) *Phillips v. State*, 338 Ga. App. 231, 231 (789 SE2d 421) (2016).

So viewed, the evidence presented at the motion to suppress hearing showed that on the day of the armed robbery, an Atlanta Police Department officer received a call that a stolen, dark-colored Camaro had been located near some lofts on Metropolitan Parkway and that there was a man "trying to sell the rims off of his vehicle to some other guys in a white Charger with Alabama tags." When the officer arrived at the location, he saw a dark Camaro in one of the parking spaces next to a white Dodge Charger with Alabama tags. The man in the driver's seat of the Camaro, who had been speaking to two men standing next to the Charger, took off running as soon as he saw the officer pull up. The officer tried to apprehend that individual, but he slipped through a sliding fence as it was closing and he was unable to pursue him.

15

The other men got in the Charger and began to drive out of the complex. Because the vehicles he located perfectly matched the description given by the caller, the officer followed the Charger and initiated a stop to identify the occupants and investigate whether they knew that the rims had been stolen.

When he approached the vehicle, he immediately smelled a "pretty strong smell of marijuana, fresh marijuana coming from inside the car." The driver, identified as Jorge Andrews, immediately said, "Man, I ain't going to lie, I don't have a license." The passenger, Redding, did have a license, and the officer ran a search on both men. He discovered that Jorge Andrews had a suspended license and that Redding had an outstanding arrest warrant for domestic violence. The officer placed both men under arrest and conducted an inventory search of the vehicle, which he had learned was a rental car. He located a small baggy of fresh marijuana between the passenger front seat and the side console and two firearms under the back bench seat.

In its order denying the motion to suppress, the trial court found that, at the location identified by the victim, the officer observed two vehicles matching the victim's description, at which time the occupant of the stolen vehicle jumped out and fled on foot and the two men he had been speaking to entered the Charger and drove away. Thus, the trial court concluded that the responding officer had "specific and

articulable facts sufficient to give rise to a reasonable suspicion of criminal conduct and, therefore, the stop of the rental vehicle was lawful." In addition, the officer's subsequent search of the vehicle was proper as an inventory search after both occupants were taken into custody.

"An authorized officer may stop an automobile and conduct a limited investigative inquiry of its occupants, without probable cause, if he has reasonable grounds for such action – a founded suspicion is all that is necessary, some basis from which the court can determine that the detention was not arbitrary or harassing." (Citation and punctuation omitted.) *Lamb v. State*, 269 Ga. App. 335, 336-37 (604 SE2d 207) (2004). "The primary means by which officers acquire reasonable suspicion of criminal wrongdoing is personal observation, but information acquired from an informant may form the basis for reasonable suspicion if the information exhibits a sufficient indicia of reliability." (Citation omitted.) *Grandberry v. State*, 289 Ga. App. 534, 536 (1) (658 SE2d 161) (2008). Information provided by an identified crime victim is presumed to be reliable. Thus, "[p]olice are entitled to assume the veracity of the alleged victim or witness absent special circumstances which should put them on guard." (Citation and punctuation omitted.) Id.

17

Here, the officer had received information from the victim of a crime and was able to locate vehicles perfectly matching those described by the victim in the location provided. This was sufficient justification for a brief investigatory stop. See *Lamb*, 269 Ga. App. at 336. We also note that the officer's subsequent inventory search of the vehicle was reasonable. See *Pierce v. State*, 194 Ga. App. 481, 481-82 (1) (391 SE2d 3) (1990) (upholding inventory search where the defendant, who had been arrested for driving with a suspended license, was the sole occupant of an out-of-state rental vehicle). And "[e]vidence discovered during such an inventory search is properly seized without a warrant and is admissible into evidence at a subsequent criminal trial." *Grimes v. State*, 303 Ga. App. 808, 812 (1) (b) (695 SE2d 294) (2010). Accordingly, the trial court did not err in denying Redding's motion to suppress.

3. In his seventh enumeration of error, Redding maintains that the trial court erred in admitting the YouTube video and other social media exhibits without proper authentication. "The trial court's rulings on the exclusion or admission of evidence are reviewed for a clear abuse of discretion." (Citation and punctuation omitted.) *Riggs v. State*, 306 Ga. 759, 762 (2) (833 SE2d 112) (2019).

18

Our Supreme Court has explained that "documents from electronic sources such as the printouts from a website like MySpace are subject to the same rules of authentication as other more traditional documentary evidence and may be authenticated through circumstantial evidence." (Citation and punctuation omitted.) *Blackledge v. State*, 299 Ga. 385, 390-91 (4) (788 SE2d 353) (2016). See also *Cotton v. State*, 297 Ga. 257, 260 (3) (773 SE2d 242) (2015) (noting that rules for authentication of social media postings are unchanged from old Evidence Code).

Here, the investigator explained how she located the YouTube video and other social media postings through a search using known information and identified the materials at trial as those she had located on YouTube and that they depicted 30 Deep and Goodfellaz gang members, including Redding, whom she recognized through prior investigations. This was sufficient to authenticate the social media exhibits.[10] *Blackledge*, 299 Ga. at 391 (4) (law enforcement officer's testimony that he discovered MySpace pages by using known identifying information and that the printouts of the photographs and captions were an accurate representation of what

---

[10] Although Redding also appears to argue that the exhibits were more prejudicial than probative, the evidence was introduced solely to show that Redding was affiliated with a gang and was largely cumulative of other admissible evidence, including Redding's tattoos and prior guilty plea to criminal gang activity.

was posted on those pages was sufficient to authenticate the photographs and captions). Accordingly, this enumeration of error is without merit.

4. Redding also asserts that the trial court erred in failing to declare a mistrial after Culbreath testified that the guns shown to him were the guns used in the armed robbery.

The record shows that Culbreath first testified that he got a good look at the guns used during the robbery and saw that they were gray and black Rugers, and one of them looked like a .45. Culbreath also stated that he had previously owned a Ruger and that is how he recognized the guns. Redding points us to the subsequent exchange on direct examination:

Q: And are those the same Ruger handguns, as best you can tell, that were used during the course of your robbery?

A: Yes, sir.

Q: Beyond the marking on the boxes and the tags that are attached to the firearms, do they appear to be in the same condition that they were in at the time that they were used?

A: Yes, sir.

When the State moved to admit the guns into evidence, Redding objected on the grounds that those types of guns are "produced in the millions" and Culbreath could not possibly identify the precise guns used in the robbery. The trial court sustained the objection and gave the following curative instruction to the jury:

> . . . The court has made a determination that this witness at this point does not have the proper foundation to specifically identify these weapons as those particular weapons used in the alleged crime, therefore that testimony that these indeed are those weapons are to be stricken and not considered by you.
>
> His testimony describing the guns based on his recollection of what he saw is admissible and you can consider that, but I've excluded the admission – or I've ruled against admitting these guns at this point. So the actual identification by the witness that these indeed are those guns should be stricken and not considered by you as evidence.

Although Redding now argues that the trial court erred in failing to declare a mistrial following Culbreath's identification of the handguns, he did not move for a mistrial below. Nor did he object after the trial court gave the curative instruction, which he specifically asked the trial court to give. Redding has therefore waived this issue for review on appeal. See *Smith v. State*, 297 Ga. 214, 215 (2) (773 SE2d 209) (2015).

21

5. Lastly, Redding asserts that his trial counsel was ineffective for failing to object to the State's closing argument when the State referred to firearms that the trial court had previously ruled would not be admitted into evidence. We are not persuaded.

To prevail on his claim of ineffective assistance, Redding must prove both that his trial counsel's performance was professionally deficient and that, but for the unprofessional performance, there is a reasonable probability that the outcome of the proceeding would have been different. See *Strickland v. Washington*, 466 U.S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984). To prove deficient performance, Redding must show that his trial counsel "acted or failed to act in an objectively unreasonable way, considering all of the circumstances and in light of prevailing professional norms." *Haney v. State*, 305 Ga. 785, 790 (2) (827 SE2d 843) (2019). To prove prejudice, Redding must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694 (III) (B). If an appellant fails to satisfy either part of the *Strickland* test, we need not examine the other part. See *Jacobs v. State*, 306 Ga. 571, 573 (2) (832 SE2d 363) (2019). In reviewing the trial court's

22

decision, "we accept the trial court's factual findings and credibility determinations unless clearly erroneous, but we independently apply the legal principles to the facts." (Citation and punctuation omitted.) *Wright v. State*, 291 Ga. 869, 870 (2) (734 SE2d 876) (2012).

Redding first points us to the following statement within the State's initial closing argument:

> Garrett Nash, who is also found at the scene where they pulled over the cars, was found with $4,500 in cash and a text message in his phone from a J. Redding. And he also admits to being at the scene to purchase the rims. And remember, that text message says, I have these Forgis for you. And we have evidence that they were Forgiatos that were the rims that were on Mr. Culbreath's car.
>
> *We also know that with Javorris Redding when he's arrested were two handguns and two handguns that were also used in the armed robbery.*
>
> Now, what is participation in a criminal street gang activity? . . .

(Emphasis supplied.) Redding also highlights a second statement in the final part of the State's closing:

> *And I guess there was something fishy about me asking him to identify the guns.* Right. Didn't see the serial number. Wasn't taking

23

down notes when you're being robbed, you know. But he is familiar with Rugers and he indicated that he thought it was a .45. Well, guess what caliber gun was found in this Defendant's car that he was arrested in. A .45 Ruger, .45.

And then counsel cross-examined him and indicated that, well, could it have been a nine. He said, well, yeah, it could have been a nine. Guess what other caliber gun was found in this Defendant's vehicle. A 9mm Ruger. That is facts that otherwise corroborate his testimony, that on the same day – we're not talking about weeks later. We're talking about hours later he is arrested in a car with two handguns underneath the back cushion of his seats.

(Emphasis supplied.)

We first note that it is not clear, when read in context, whether the State actually intended to argue that the two guns recovered at the time Redding was arrested were the same two guns used in the armed robbery. Rather, it appears that the State was inviting the inference that because Culbreath had described a 9mm Ruger and a .45 Ruger as the weapons used during the armed robbery and Redding was shortly thereafter found in a vehicle with a 9mm Ruger and a .45 Ruger, this was circumstantial evidence that Redding was one of the men who had participated in the

24

armed robbery. And the second statement was in response to an argument made by defense counsel.

Moreover, "[w]hether to object to a particular part of a prosecutor's closing argument is a tactical decision, and counsel's decision not to make an objection must be patently unreasonable to rise to the level of deficient performance." (Citations omitted.) *Peoples v. State*, 295 Ga. 44, 60 (6) (757 SE2d 646) (2014). At the new trial hearing, Redding's trial counsel testified that he could not recall this particular closing, but that it was generally his practice not to object during the State's closing because of the risk that objecting would "draw[] attention to a statement that the jury night not have even put that much stock in at that point." Based on the record, we cannot say that such trial strategy was patently unreasonable. *Peoples*, 295 Ga. at 61 (6).

*Judgment affirmed. McFadden, C. J., and Senior Appellate Judge Herbert E. Phipps concur*.

25